**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Timothy BURROWS, Defendant–
Appellant.**

**No. 94–1008.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 22, 1994.

Decided Feb. 23, 1995.

Barry Rand Elden, Asst. U.S. Atty., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL and John G. McKenzie, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Rockford, IL, for plaintiff-appellee.

John Nelson (argued), Rockford, IL, for defendant-appellant.

Before FERGUSON,* RIPPLE and ROVNER, Circuit Judges.

RIPPLE, Circuit Judge.

In this appeal, Timothy Burrows challenges his conviction for being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1). He claims that the .38 caliber revolver which led to his conviction was the fruit of an illegal search. He also submits that the district court erred in denying his motion in limine to suppress the testimony of two government witnesses. With respect to his sentence, Mr. Burrows contends that the district court erred in denying his motion for a downward departure and in ordering him to pay a $1,000 fine. For the reasons that follow, we affirm Mr. Burrows' conviction and fine. We dismiss for want of jurisdiction his challenge to the district court's failure to depart downward with respect to the sentence to incarceration.

---

* The Honorable Warren J. Ferguson of the United States Court of Appeals for the Ninth Circuit is sitting by designation.

# I

## BACKGROUND

### A. *Facts*

In November 1988, Timothy Burrows and his half-brother, Marvin McLin, allegedly pointed a handgun at Edward Provin outside the apartment of a mutual friend in Rockford, Illinois. Mr. Burrows subsequently hit Provin on the head with the weapon. Mr. Burrows and McLin then forced Walter Frazier, Provin's companion, to drive them away in Frazier's car. While in the car, either Mr. Burrows or McLin attempted to shoot Frazier in the leg.

On November 29, 1988, the Rockford Police obtained arrest warrants for McLin and Burrows. Officers then proceeded to a public housing project where they suspected the pair were staying; Mr. Burrows' mother resided there, and informants had told the police that Burrows and McLin were planning to take control of the drug activity in the area. One officer, Officer Vincere, observed a curtain moving in an upstairs window of the apartment belonging to Mr. Burrows' mother. The curtain was in a room Vincere thought was a bedroom, and he informed the other officers. Burrows and McLin were believed to be located in that two-level apartment. The police knocked at both entrances to this unit and identified themselves. No one opened the doors. After ten to fifteen minutes, the manager of the housing project arrived and attempted, unsuccessfully, to open the doors. During this period, officers heard movement inside the apartment. The police then summoned a locksmith. As he was working on one of the doors, McLin opened it. The police arrested McLin and moved inside.

Officer Vincere observed a flight of stairs leading up. He climbed the stairs and encountered six doors facing the landing. Five were closed; the sixth opened onto the bathroom where Mr. Burrows was sitting. Officer Vincere confronted Mr. Burrows and placed him under arrest. Two other officers, Ekedahl and Forrester, had come upstairs to assist Officer Vincere. Ekedahl, Forrester, and a third officer, who apparently was on the landing as well, decided to open each of the other doors on the landing and to conduct a security sweep. Finding the doors locked, the officers forced them open. Four of the doors led to bedrooms and one opened onto a linen closet. In one bedroom, the police observed, in plain view, a .38 caliber revolver. Mr. Burrows' fingerprint was discovered on the gun.

### B. *Earlier Proceedings*

#### 1. Suppression Hearing

Mr. Burrows was charged with being a felon in possession of a firearm. *See* 18 U.S.C. § 922(g)(1). Prior to his trial, Mr. Burrows moved to suppress the handgun on the ground that the police had obtained it through an illegal search. At the suppression hearing, Officers Vincere and Ekedahl indicated that the following factors heightened the officers' concerns for their safety: the nature of the charge against Mr. Burrows, his prior conviction for a crime involving firearms, the area in which the housing project was located, the fact that, in the officers' experience, such housing units often contained unauthorized residents, the movement of the curtain in what Vincere believed to be one of the upstairs bedrooms, the probable presence of Mr. Burrows' mother, and the time delay between the officers' arrival on the scene and their entry. The officers also testified concerning the nature and duration of the search. Officers Forrester and Vincere testified that the search of the bedrooms and closet began while Mr. Burrows was upstairs; Officer Ekedahl thought that the search began after Officer Vincere had started to lead Mr. Burrows downstairs. Officer Ekedahl also testified that the officers searched the four bedrooms rapidly, one at a time. He later indicated that "[t]he actual search, I believe, probably took around five minutes." R.50 at 46.

The district court denied Mr. Burrows' motion and upheld the search on the authority of *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). First, it stated that the search was valid because it occurred in an area adjacent to the place of

arrest and took place at the time of arrest.[1] The court reviewed a sketch of the premises and found that the five doors were in an area adjacent to the bathroom. In the district court's view, these doors were in an area "adjoining the place of arrest from which an attack could be immediately launched." R.50 at 78. The court also found that the sweep was begun while the "arrest was being effectuated." *Id.* On the basis of these findings, the court first concluded that, "while the defendant was still in an arrest situation," the officers were justified in searching the rooms behind the doors for their own protection. *Id.* at 79.

As an alternative basis for sustaining the officers' action, the district court examined whether there were sufficient articulable facts which, taken together with reasonable inferences from those facts, would support a reasonable officer's determination that the rooms ought to be swept for the officer's protection. The court ruled that the search was valid as a "protective sweep" because the officers reasonably could have believed that the areas they searched harbored a dangerous individual. The district court supported that conclusion by observing first that the officers had some indication that there might be other persons in the apartment. It was known that Mr. Burrows' mother was the listed occupant of the building. The court commented that the officers had been refused admission to the apartment for a period of twenty to thirty minutes, a factor that might also "indicate to an objective person,

to an officer, that someone else might be present." *Id.* The court also noted that, while the officers were outside, they had observed movement in the apartment and that this observation also raised the contingency of another person being present. The doors were all locked, observed the court, a factor that also might lead to suspicions on the part of the officers. The court further noted that this apartment was in a high-crime area, a housing project where the presence of unauthorized persons was a frequent occurrence. Moreover, continued the court, the officers were in the process of arresting a defendant, who had a history of violence, for another crime of violence. The possibility of gang activity was also a factor.

### 2. The Trial

Mr. Burrows filed a motion in limine to exclude the testimony of Provin and Frazier, witnesses the government intended to call to establish that Mr. Burrows had the opportunity to possess a handgun on the day he was arrested. Mr. Burrows argued that the probative value of their testimony that he had threatened them with guns did not outweigh its prejudicial effect. The district court denied his motion. However, at trial it gave limiting instructions to the jury following each witness' testimony and an additional cautionary instruction after the closing arguments.[2]

The jury found Mr. Burrows guilty. During the sentencing phase, he moved for a

---

**1.** The district court found that Mr. Burrows had standing to contest the search because there was sufficient evidence that he was a resident in his mother's apartment.

**2.** Following Provin's direct examination, the court noted that his testimony:

> is admitted and limited only to the question of the opportunity of the defendant to possess the weapon that he is charged with possessing on November 29th, 1988, and it is not admitted for any other purpose. So, you shall not consider it for any other purposes other than the opportunity to possess a weapon that he's charged with possessing on November 29th of 1988.

R.52 at 121. Following Mr. Frazier's direct examination, the court stated:

> [T]he events that this witness has testified to are only relevant as to the opportunity to pos-

sess the weapon, a weapon that he's charged with possessing on November 29th, 1988, and for that purpose only.
> So, the events are not to be considered by you as evidence of guilt, except as they relate to the opportunity to possess the weapon on the date charged, and they're not to be taken by you as other bad acts on the part of the defendant. You are not to consider them for that purpose, and you must consider it only for the limited purpose that I've told you about.

*Id.* at 127. At the close of trial, the court again instructed the jury:

> You heard evidence of acts of the defendant occurring in mid-November 1988 other than those charged in the indictment. You may consider this evidence only on the question of the opportunity to possess the firearm. This evidence is to be considered by you only for this limited purpose.

R.53 at 172.

downward departure from the recommended guideline range of 235 to 293 months, pursuant to U.S.S.G. § 5K2.0. Mr. Burrows contended that both his counsel and the government had believed that he would be sentenced to no more than 15 years. He also claimed that the pre-sentence investigation over-represented his criminal history. The district court denied his motion and sentenced him to 264 months of imprisonment. It also determined that Mr. Burrows, who was represented by appointed counsel and possessed limited financial resources, had no present ability to pay a fine. However, the court ordered a $1,000 fine on the ground that Mr. Burrows could earn money in prison under the Inmate Financial Responsibility Program.

## II

## ANALYSIS

### A. *The Protective Sweep*

Justice White succinctly defined a "protective sweep" in *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990):

> A "protective sweep" is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding.

*Id.* at 327, 110 S.Ct. at 1094. The circumstances under which such a search might be undertaken were also clearly described:

> [T]he Fourth Amendment would permit the protective sweep undertaken here if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others.

*Id.* (internal citations and quotations omitted).

The Court made clear in *Buie* that its description of the circumstances in which such a sweep could take place legally was grounded in the Fourth Amendment's core requirement that such intrusions into the privacy of individuals be reasonable. Thus, the justification for the "protective sweep" is grounded in traditional Fourth Amendment jurisprudence, and individual applications of the exception must be evaluated in terms of their reasonableness. "The Fourth Amendment bars only unreasonable searches and seizures." *Id.* at 331, 110 S.Ct. at 1096.

In determining the reasonableness of a given intrusion, the individual's interest in the protection of the Fourth Amendment must be balanced against legitimate governmental interests. *Id.* Under this approach, continued the Court in *Buie*, the search of a home or an office is generally not reasonable unless it is undertaken on the basis of a warrant issued on probable cause. Nevertheless, there are a few narrow and carefully defined situations in which the limited nature of the intrusion and the importance of the governmental interest make neither probable cause nor a warrant necessary. For instance, in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Court recognized the need for a law enforcement officer to conduct a limited pat-down for weapons when specific articulable facts, as opposed to a mere inchoate and unparticularized suspicion or hunch, lead the officer to believe that the individual encountered is armed and dangerous. The approach of *Terry* was later applied to the context of an officer's encounter with a motorist in which the officer has a reasonable belief, based on articulable suspicions, that the motorist is dangerous and may gain immediate control of weapons. In this context also, a search of the passenger compartment limited to those areas in which a weapon might be placed is permissible. *See Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

Justice White made clear in *Buie* that the same considerations that justify the exceptions in *Terry* and *Long* animate the exception for the "protective sweep." Law enforcement officers have an interest in ensuring their safety when they lawfully enter a house to effect an arrest. That interest justifies their ensuring that the dwelling does not harbor another person who is dangerous and who unexpectedly could launch an at-

**1016**

tack. In that context, the Justice noted that the officer is in at least as much danger as the officer in the *Terry* or *Long* situation. The officers are involved in the serious business of arresting an individual; they are in a confined setting on the adversary's "turf." "[T]he arresting officers are permitted in such circumstances to take reasonable steps to ensure their safety after, and while making, the arrest." *Buie,* 494 U.S. at 334, 110 S.Ct. at 1098. The operation, however, is a sweep, not a "full search of the premises." *Id.* at 335, 110 S.Ct. at 1099. It "may extend only to a cursory inspection of those spaces where a person may be found." *Id.* (footnote omitted). "The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335–36, 110 S.Ct. at 1099.

 *Buie* makes clear that the "Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 337, 110 S.Ct. at 1099. As our cases applying the guidance of *Buie* make clear, the inquiry is necessarily a very fact-specific one and requires that the circumstances of the particular encounter be assessed carefully in light of the overarching policy concerns articulated in *Buie* and in its first cousins, *Terry* and *Long.*[3] In each instance, the particular configuration of the

dwelling[4] and the characteristics of those known to be present and who might be present must be the primary focus of the officers' assessment.[5] Moreover, although never adequate standing alone to justify a sweep,[6] the general surroundings, especially its history in previous law enforcement efforts, must enter into the calculus. This latter estimation must be based on actual historical facts, not stereotypes. A protective sweep is not justified simply because an area is "poor" or a "housing project." It is very relevant, however, that a neighborhood has been the recent scene of other violence or civil strife aimed at law enforcement officers[7] or that there are other articulable reasons for believing that; at the present, the area presents a real threat to the safety of the officers. Needless to say, the race or ethnic background of the residents of the dwelling is not a factor upon which the officers may rely. We have also recognized that officers may be at as much risk while in the area immediately outside the arrestee's dwelling as they are within it.[8] "A bullet fired at an arresting officer standing outside a window is as deadly as one that is projected from one room to another." *United States v. Hoyos,* 892 F.2d 1387, 1397 (9th Cir.1989), *cert. denied,* 498 U.S. 825, 111 S.Ct. 80, 112 L.Ed.2d 52 (1990). Of course, all these factors must be assessed from the perspective of the officer on the scene. It is the reasonableness of the officer's judgment at the time he was required to act that counts.

3. This analytical kinship was recognized by Judge Rovner in *United States v. Arch,* 7 F.3d 1300, 1303 (7th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1123, 127 L.Ed.2d 431 (1994), in which she noted that the protective sweep authorized by *Buie* "derives from" *Terry.*

4. *See, e.g., United States v. Richards,* 937 F.2d 1287, 1291 (7th Cir.1991) (noting that an "ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings").

5. *See, e.g., United States v. James,* 40 F.3d 850, 863 (7th Cir.1994) (finding no Fourth Amendment violation where officer quickly searched bedroom closet and jacket located therein, where officers had encountered multiple individuals in the dwelling, had arrested one suspect just outside the bedroom, and had found a semiautomat-

ic rifle in the bedroom), *cert. denied,* — U.S. ——, 115 S.Ct. 948, 130 L.Ed.2d 891 (1995), *cert. denied,* — U.S. ——, 115 S.Ct. 1160, 130 L.Ed.2d 1116 (1995); *United States v. Barker,* 27 F.3d 1287, 1291 (7th Cir.1994) (stating that officer had reasonable belief that area swept harbored dangerous individuals because a second officer's prior dealings with defendant indicated that firearms and multiple individuals could be present).

6. *See Buie,* 494 U.S. at 334 n. 2, 110 S.Ct. at 1098 n. 2.

7. *Cf. United States v. Richards,* 937 F.2d 1287, 1291 (7th Cir.1991) (noting that the neighborhood in question "was one of the most violent and dangerous" in the city).

8. *See Arch,* 7 F.3d at 1303–04 (collecting cases).

■ We have reviewed carefully the record in this case and conclude that it supports the determination made by the district court. Although the officers stressed that the violent reputation of the area where the arrest was made increased substantially their apprehension, they also noted that the particular circumstances surrounding the arrest made them especially concerned about their safety. Mr. Burrows and McLin were suspected of committing a violent crime involving a firearm; Mr. Burrows had a history of violent criminal activity, and the pair was allegedly planning to control the local drug trade. Upon arriving on the scene, Officer Vincere observed movement in an upstairs window. Finally, although the officers repeatedly announced their presence, those in the apartment had refused them entry, yet could be heard moving about inside. Thus, the doors at the second floor landing where Mr. Burrows was arrested gave the officers understandable cause for concern.

■ In addition, the officers' search took "no longer than [was] necessary ... to complete the arrest and depart the premises." Although Mr. Burrows claims that the search was too lengthy, the record supports the determination that the search of the four bedrooms and linen closet, which required the officers to force four locked doors, took no more than five minutes, an interval compatible with the officers' legitimate purpose. The Supreme Court's pronouncement in *Buie*, as well as subsequent caselaw, make it clear, moreover, that the officers had the right to ensure their safety and the safety of everyone else in the area not only during the arrest itself but also during the remainder of the time that they were legally on the premises and its environs.[9]

Protective sweeps, as *Buie* recognizes, are a necessary fact of life in the violent society in which our law enforcement officers must perform the duties of their office. We must also recognize, however, that the sweep is a device that can easily be perverted to achieve ends other than those acknowledged as legitimate in *Buie*. Given the fact-intensive na-

---

9. The Supreme Court stated that the protective sweep may not last longer than the time it takes "to complete the arrest *and depart* the premises." *Buie*, 494 U.S. at 336, 110 S.Ct. at 1099 (emphasis added). An unknown assailant who attacks officers departing from an arrestee's home poses an equivalent, if not greater, risk to the safety of the officers and others as does the assailant who attacks the officers upon entry. *Cf. Arch*, 7 F.3d at 1303–04 (recognizing that arresting officers face similar dangers whether they are inside or just outside an arrestee's dwelling). Thus, the particular facts associated with an arrest may necessitate that officers conduct a protective sweep before they can safely depart the premises. Various cases have relied, at least in part, upon this principle to uphold *Buie*-type sweeps. *See, e.g., United States v. Johnson*, 9 F.3d 506, 510 (6th Cir.1993) (upholding brief search of apartment, even though it began after officers investigating burglary had ordered four individuals out and had placed them in squad cars, because police "did no more than secure the premises to ensure the protection of everyone on the scene and to prevent the loss or destruction of the owner's property"), *cert. denied*, — U.S. —, 114 S.Ct. 2690, 129 L.Ed.2d 821 (1994); *United States v. Mendoza–Burciaga*, 981 F.2d 192, 197 (5th Cir.1992) (noting that officers, who had arrested two narcotics coconspirators in high-speed chase and two more just outside a house, "would be in great danger" if additional armed individuals remained inside the home, and finding that officers' warrantless entry and protective sweep constituted "minimally necessary steps to secure the house" for purposes of ensuring safety and safeguarding evidence), *cert. denied*, — U.S. —, 114 S.Ct. 356, 126 L.Ed.2d 320 (1993); *United States v. Kimmons*, 965 F.2d 1001, 1009–10 (11th Cir.1992) (upholding sweep in case involving bank robbery conspiracy where officers had arrested two coconspirators away from the premises and had ordered defendant out of his house and arrested him, but were unsure of the whereabouts of a fourth coconspirator), *cert. denied*, — U.S. —, 113 S.Ct. 1065, 122 L.Ed.2d 370, *vacated on other grounds*, — U.S. —, 113 S.Ct. 2326, 124 L.Ed.2d 239 *and reinstated on remand*, 1 F.3d 1144 (11th Cir.1993); *United States v. Soria*, 959 F.2d 855, 857–58 (10th Cir.) (upholding sweep in narcotics case where officers arrested defendant short distance from body shop and then conducted sweep of body shop to ensure there were no individuals inside who might open fire on them or destroy evidence; Chief Judge McKay, concurring in the result, stated that the sweep was unnecessary because the body shop became a threat only after the officers approached it to conduct the sweep), *cert. denied*, — U.S. —, 113 S.Ct. 236, 121 L.Ed.2d 171 (1992). *But cf. United States v. Hogan*, 38 F.3d 1148, 1150 (10th Cir.1994) (invalidating sweep where there was no indication that trailer which was swept harbored hidden accomplice, sweep lasted two hours, and officers admitted that, after calling defendant into street and arresting him, they "could have just put [the defendant] in the car and driven away"), *cert.*

ture of the inquiry and the resulting deferential standard of appellate review, the Constitution depends in large measure on the magistrate judges and the district courts to preserve the balance required by the Fourth Amendment. Their careful, detached and demanding scrutiny is, realistically, the most effective weapon we have against the erosion of the Fourth Amendment.

### B. *Motion in Limine to Suppress Witnesses' Testimony*

■ Mr. Burrows next submits that the district court erred in allowing Provin and Frazier to testify concerning the acts (armed robbery, home invasion, and unlawful restraint) that led to his 1988 arrest, and, in turn, to the discovery of the firearm. Mr. Burrows contends that the prejudicial effect of this testimony outweighed its relevance. *See United States v. Zapata,* 871 F.2d 616, 620 (7th Cir.1989) (noting that admissibility of evidence under Rule 404(b) is governed by four-part test that inquires, in relevant part, whether "the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice"). He notes that one witness could not identify him and that, although the other could identify him, he also testified that Mr. Burrows possessed a gun different from the one discovered by the police. Mr. Burrows acknowledges that the district court cautioned the jury after the testimony of each witness, but claims, incorrectly, that the court failed to give any cautionary jury instruction. The government counters that the district court did not abuse its discretion in allowing Provin and Frazier to testify concerning Mr. Burrows' prior acts involving handguns because the testimony was probative of Mr. Burrows' opportunity to possess a handgun. The government emphasizes that the district court gave limiting instructions to the jury following the testimony of each witness, and that the court also gave a cautionary jury instruction. Alternatively, the government argues that, even if

the district court erred in allowing this testimony, the error was harmless in light of the other evidence of Mr. Burrows' guilt.

We review the district court's evidentiary ruling for abuse of discretion. *United States v. Wilson,* 31 F.3d 510, 514 (7th Cir.1994); *United States v. Kreiser,* 15 F.3d 635, 640 (7th Cir.1994). We cannot say that the district court abused its discretion in admitting testimony concerning the underlying offenses for which Mr. Burrows was arrested in 1988. The government sought to admit the disputed testimony to establish that Mr. Burrows had the opportunity to possess a handgun on the day he was arrested.[10] The testimony recounted incidents that occurred only two weeks prior to Mr. Burrows' arrest. After each witness testified, the district court reminded the jury that this evidence was pertinent only to the limited issue of whether Mr. Burrows had the opportunity to possess a handgun when he was arrested. The court also provided a cautionary jury instruction.[11]

■ Even if the district court had abused its discretion, Mr. Burrows' sentence cannot be reversed because any error in admitting this testimony is harmless. The prosecution established that Mr. Burrows was a felon and presented evidence that a .38 caliber revolver, containing Mr. Burrows' fingerprint, was found in his residence. This evidence alone is more than sufficient for conviction. The admission of the evidence at issue did not produce a jury verdict other than the one that would have been rendered in its absence.

### C. *The $1,000 Fine*

■ Mr. Burrows contends that the district court erred in imposing a $1,000 fine upon him because the facts demonstrated that he had no ability to pay. He notes that, under U.S.S.G. § 5E1.2, comment. (n. 3), the fact that he was represented by appointed counsel strongly suggests that he had no

---

*denied,* —— U.S. ——, 115 S.Ct. 1323, 131 L.Ed.2d 203 (1995).

**10.** *Cf. United States v. Covelli,* 738 F.2d 847, 855–56 & n. 14 (7th Cir.) (finding that the district court did not err in admitting, for purposes of establishing the defendant's possible possession of the murder weapon and opportunity to com-

mit the crime, the testimony of two witnesses who indicated that the defendant possessed a firearm seven months and three years, respectively, prior to the commission of the robbery and murder), *cert. denied,* 469 U.S. 867, 105 S.Ct. 211, 83 L.Ed.2d 141 (1984).

**11.** *See supra* note 2.

ability to pay the fine. He also contends that there is no evidence that he would be able to pay this fine during the twelve-month installment period the Guidelines recommend in cases of financial hardship. *See* U.S.S.G. § 5E1.2(g). He acknowledges the district court's finding that he could earn $1,000 through the Inmate Financial Responsibility Program, but contends that this finding is "utterly without legal authority under the sentencing guidelines." Appellant's Br. at 25. The government submits that Mr. Burrows waived this claim by not raising it in the district court. The government also points out that the district court considered Mr. Burrows' present and future ability to pay any fine. Because the district court found that Mr. Burrows could earn money in prison under the Inmate Financial Responsibility Program, contends the government, the court did not err in imposing the $1,000 fine.

Because Mr. Burrows never objected to the imposition of a fine during the sentencing hearing and specifically did not object when the district court actually imposed the $1,000 fine, our review is limited to plain error. Our recent decision in *United States v. Gomez*, 24 F.3d 924 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 280, 130 L.Ed.2d 196 (1994), makes clear not only that the district court did not plainly err, but also that the court committed no legal error in imposing a fine to be paid through Burrows' participation in the Inmate Financial Responsibility Program. *See* 28 C.F.R. §§ 545.10–545.11 (outlining program). In *Gomez*, we held that district courts assessing fines under the Sentencing Guidelines may consider an indigent

defendant's ability to earn money under this program. 24 F.3d at 927. Other courts of appeals have reached the same result.[12]

### D. *District Court's Denial of Downward Departure*

■ Mr. Burrows also argues that the district court erred in denying his motion for a downward departure pursuant to U.S.S.G. § 5K2.0. He cites various factors that the district court allegedly overlooked, including his attorney's poor advice, his own alleged mental impairment, and the delay in bringing his case to trial. The government argues that we lack jurisdiction because the district court considered Mr. Burrows' motion for a downward departure and denied it.

The government is correct. The district judge considered Mr. Burrows' motion for a downward departure, rejected it, and imposed a sentence within the applicable Guideline range. Accordingly, we lack jurisdiction to review the district court's decision. *United States v. Jones*, 34 F.3d 495, 499 (7th Cir.1994); *United States v. Sablotny*, 21 F.3d 747, 749 & n. 2 (7th Cir.1994).

### CONCLUSION

For the foregoing reasons, we dismiss for lack of jurisdiction the part of the appeal that seeks review of the district court's decision not to depart downward from the applicable guideline range with respect to Mr. Burrows' sentence to incarceration. In all other re-

---

12. *See United States v. Francisco*, 35 F.3d 116, 121–22 (4th Cir.1994) (finding $2,000 fine valid because defendant had not objected at sentencing, district court had specifically found that defendant could pay no more than $2,000, and PSR stated that inmate could earn money through the Inmate Financial Responsibility Program), *cert. denied,* —— U.S. ——, 115 S.Ct. 950, 130 L.Ed.2d 893 (1995); *United States v. Fermin*, 32 F.3d 674, 682 n. 4 (2d Cir.1994) (finding no error in district court's assessment of $2,500 fine to be paid out of defendant's likely prison earnings), *cert. denied,* —— U.S. ——, 115 S.Ct. 1145, 130 L.Ed.2d 1104 (1994); *United States v. Taylor*, 984 F.2d 618, 622 (4th Cir.1993) (finding, in case in which defendant failed to object at sentencing, that district court did not err in imposing $2,000 fine to be paid through Responsibility Program);

*United States v. Turner*, 975 F.2d 490, 498 (8th Cir.1992) (finding no clear error in imposition of $25,000 fine to be paid through Responsibility Program), *cert. denied,* —— U.S. ——, 113 S.Ct. 1053, 122 L.Ed.2d 360 (1993); *cf. United States v. Webb*, 30 F.3d 687, 691 (6th Cir.1994) (noting that incarcerated defendants may continue to pay restitution through the Responsibility Program); *United States v. Williams*, 996 F.2d 231, 234–35 (10th Cir.1993) (finding no abuse of discretion in district court's order of $13,000 in restitution, which was based, in part, on defendant's ability to earn money through the Responsibility Program, and indicating that average inmate could earn up to $1,000 per year in prison, one-half of which could be applied toward fines and restitution).

spects, the judgment of the district court is affirmed.

AFFIRMED.