UNITED STATES of America,
Plaintiff,

v.

Donell GOSHA, Osmond Clarke, Christopher L. Harris, David Nevins, George Jackson, Jimmy Campbell, James Streeter, Debra Robinson, Adrena Robinson, and Karnese Driver, Defendants.

No. IP 98–121–CR H/F.

United States District Court,
S.D. Indiana,
Indianapolis Division.

April 27, 1999.

Josh Minkler, Asst. U.S. Atty., Indianapolis, IN, for Plaintiff.

William Dazey, Indianapolis, IN, for Gosha.

Howard N. Bernstein, Indianapolis, IN, for Christopher L. Harris.

Timothy Burns, Indianapolis, IN, for Debra Robinson.

Robert M. Hammerle, Indianapolis, IN, for Adrena Robinson.

Richard Loiseau, Indianapolis, IN, for Osmond Clarke.

Larry Champion, Indianapolis, IN, for David Nevins.

Carl Epstein, Indianapolis, IN, for George Jackson.

Mark Inman, Indianapolis, IN, for Jimmy Campbell.

Martin Solomon, Indianapolis, IN, for James Streeter.

Jeffrey Mendes, Indianapolis, IN, for Karnese Driver.

## ENTRY ON PENDING MOTIONS

HAMILTON, District Judge.

On April 9, 1999, the court held a hearing on numerous pending motions in this case. The court resolved most of the pending motions at the hearing but took three motions under advisement. First, defendant Chris Harris has moved to dismiss the indictment pursuant to *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). Second, defendant Debra Robinson has moved to suppress evidence seized as a result of a police "walk-through" of her home when the police arrested her on a warrant for contempt of court. Third, defendant Adrena Robinson has moved to suppress cocaine seized from suitcases she was carrying, arguing that the search warrant supporting the search of the suitcases was defective. Other defendants have joined in these motions orally. As explained below, the court denies these three motions.

### I. *Chris Harris's Motion to Dismiss the Indictment*

Defendant Harris is charged in count one of the superseding indictment with violating 21 U.S.C. § 846 by conspiring to distribute and to possess with intent to distribute cocaine and crack cocaine base in violation of 21 U.S.C. § 841(a)(1). Section 846 provides that a person who attempts or conspires to violate a substantive statute like § 841 "shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." Count one alleges that the conspiracy involved a quantity in excess of five kilograms. See 21 U.S.C. § 841(b)(1)(A)(ii) (penalties for violation of § 841(a)(1) involving five kilograms or more of cocaine).

Harris argues that the indictment should be dismissed because it fails to allege more specifically the quantity of cocaine and crack attributable to him and because it fails to allege the potential sentence he faces. Under the reasoning of *Jones v. United States,* Harris contends the superseding indictment in this case must be dismissed because it does not allege the quantity of drugs attributable to Harris in the much more specific terms of the drug quantity table in § 2D1.1(c) of the United States Sentencing Guidelines.

■ Whether a fact is an element of an offense or instead a sentencing consideration has important consequences. The classification determines whether the fact must be alleged in the indictment by grand jury, proven beyond a reasonable doubt, and submitted to the jury at trial, or whether instead the issue may be decided by a judge based on a preponderance of the evidence at a sentencing hearing where the Federal Rules of Evidence do not apply. In *Jones v. United States,* the Supreme Court addressed a similar problem under the carjacking statute, 18 U.S.C. § 2119, which provides:

> Whoever, with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall -
>
> (1) be fined under this title or imprisoned not more than 15 years, or both,
> (2) if serious bodily injury ... results, be fined under this title or imprisoned not more than 25 years, or both, and
> (3) if death results, be fined under this title or imprisoned for any number of years up to life, or both, or sentenced to death.

The Supreme Court held in *Jones* that § 2119 establishes three separate offenses, so that a defendant is not subject to the enhanced penalties specified in subsections (2) and (3) for serious bodily injury or death unless those additional elements are charged by indictment, proven beyond a reasonable doubt, and submitted to the jury.

■ The holding in *Jones* was based on both a close parsing of § 2119 and similar statutes and the principle that criminal statutes should be construed to avoid serious constitutional problems. Focusing on the significant enhancements in penalties resulting from serious bodily injury or death, including enhancement from a maximum 15 years in prison to possible application of the death penalty, the Court concluded that imposing the enhanced penalties based on a factual determination at a sentencing proceeding, rather than a full trial on the merits, would raise serious constitutional questions about the right to trial by jury.

Defendant Harris argues that the same reasoning should be applied to the rungs of the ladder of drug quantities in § 2D1.1(c) of the Sentencing Guidelines. The court disagrees.

Considering first the question of statutory interpretation, under the Sentencing Reform Act of 1984, the Sentencing Commission's task was to develop guidelines for the exercise of judicial judgment in sentencing. See 28 U.S.C. § 994. Both the wide range of factors relevant under the Sentencing Guidelines (including a great deal of information that would be highly prejudicial and irrelevant at trial, such as the details of the defendant's criminal history) and the sentencing judge's discretion to depart from the resulting guideline sentence weigh heavily against the suggestion that guideline factors more generally should be treated as elements of offenses. Neither aspect of the Guidelines is compatible with submitting the factual issues to the jury at the trial on guilt or innocence.

With respect to the more specific issue of the levels in the drug quantity table in § 2D1.1(c), Congress and the Sentencing Commission plainly intended to allow consideration of drug quantities beyond the scope of a specific substantive charge. For example, if a defendant is charged with possession with intent to distribute on a specific date (the date of a controlled buy or an arrest), the Sentencing Guidelines direct the sentencing court to consider as relevant conduct in calculating the sen-

tence the defendant's other acts "that were part of the same course of conduct or common scheme or plan" as the offense of conviction. See U.S.S.G. § 1B1.3(a)(2). Rather than establishing each rung of the ladder in the drug quantity table as a separate substantive offense, Congress and the Sentencing Commission used those rungs to guide the sentencing court in determining a sentence within the broad statutory parameters. Thus, as a matter of statutory construction, the court concludes that Congress did not intend to incorporate into distinct statutory drug offenses each rung of the ladder of drug quantities and associated range of penalties in the Sentencing Guidelines.[1]

*Jones* also has at least a tentative constitutional foundation. The Court did not hold that a different interpretation of the carjacking statute would violate the Constitution, but it based its statutory interpretation in part on the premise that a different interpretation would raise serious constitutional issues. It remains to be seen how far the Court will extend the reasoning of *Jones*, which in turn limited the holding of *Almendarez–Torres v. United States*, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). In that case the Court held that 8 U.S.C. § 1326(b), which provides higher penalties for immigration offenses based on the defendant's criminal record, specifies only sentencing factors rather than elements of the offense, so that the indictment need not allege the bases for the enhanced penalties, nor must those issues be submitted to the jury for proof beyond a reasonable doubt. This court sees no sign in the *Jones* majority opinion that the Court is prepared to extend its reasoning to other guideline factors in general or to the drug quantity table in particular. Defendant Chris Harris's motion to dismiss the superseding indictment based on the reasoning of *Jones* is therefore denied.

## II. *Debra Robinson's Motion to Suppress*

Defendant Debra Robinson was arrested on September 2, 1998. She seeks to suppress as evidence two suitcases and their contents—cocaine. The drug task force found the suitcases in her home at the time of her arrest and searched them later pursuant to a warrant. All the evidence of the circumstances is set forth in the transcript of a probable cause hearing before Judge Carroll of the Madison Superior Court. The transcript covers two different hearings on the same day. At the first hearing, the judge heard evidence about an ongoing investigation into cocaine trafficking in Anderson. The police presented information that six unidentified defendants in federal cocaine prosecution cases had separately identified Chris Harris as their main source of supply in Anderson. Another informant provided a videotaped statement. The judge took care to ensure that all the informants' statements had been against their penal interests.

At the morning hearing, the drug task force sought a search warrant for 2414 Dover Street in Anderson. They presented information that Chris Harris had been living in the house very recently. Harris had been using an alias when he had been arrested earlier that day. He also had been the subject of a felony warrant from Anderson for about 14 months. The drug task force also informed the judge that Harris had been arrested while driving a car that was registered to Debra Robinson, and that Debra Robinson had been stopped in New Mexico by DEA agents earlier in 1998. She then had about $125,-000 cash on her person and told the DEA agents that she was taking it to California. The task force also told the judge that their latest informant had reported that she had delivered a large of sum of money to the Dover Street house within the past week, and she had watched as the money was counted in a mechanical money counter and then wrapped in "bricks" of cash. At the end of the morning hearing, the court found probable cause for issuance of a search warrant for the Dover Street house for items related to trafficking in cocaine. Tr. 13–14.

---

1. Harris's motion does not address the treatment of the factors set forth in 21 U.S.C. § 841(b) that govern the applicable range of penalties.

The second hearing took place at 10 p.m. the same day. At the second hearing, the drug task force sought a warrant to search Debra Robinson's residence at 2038 Lafayette Street in Anderson, Indiana, including luggage that the task force suspected had been used to transport and conceal cocaine. The judge incorporated the record from the earlier hearing with respect to the overall operation and Debra Robinson's ties to Harris. The judge also heard new evidence, primarily about a statement that Karnese Driver had made earlier that day and about the arrest of Debra Robinson on a warrant for contempt of court.

Karnese Driver had told the task force that Chris Harris was her boyfriend, and she described the arrangements for receiving cocaine from California in luggage through the Indianapolis airport. Driver's statement tended to corroborate the information the task force had previously obtained concerning Harris and the distribution operation.

With respect to Debra Robinson's house at 2038 Lafayette Street, the task force informed the judge that Debra Robinson lived there at the time. The officers also reminded the judge of the earlier evidence showing that Chris Harris had been driving a vehicle registered to Debra Robinson and that she had been stopped earlier in the year with $125,000 cash. The officers also had evidence that Debra Robinson was dating Harris. The evidence also showed that Harris had received a shipment of cocaine in Anderson two or three days earlier and was expecting another shipment the week of the hearing.

Detective Kevin Early testified that, after serving the earlier search warrant on the Dover Street house on September 2nd, he carried out what the police call a "stop and knock" at 2038 Lafayette Street. Early talked with Debra Robinson, who was at the home with her son, who was 10 or 11 years old. The police left but later learned that there was an outstanding warrant for arrest of Debra Robinson for contempt of court.

The police then returned to 2038 Lafayette Street to arrest Debra Robinson on the warrant. Detective Early testified:

A   * * * We went back to her residence, arrested her for that. As we were in the house, we walked through the house to make sure nobody else was in there. Actually, before I placed her under arrest, I asked her if I could talk to her for a minute. We stepped in her bedroom. And while we were in there talking, I noticed a large black, looked like hard plastic suitcase up against the wall. I didn't ask her about the suitcase. We took her on out in the living room. She was placed under arrest. I went in another bedroom, a small child's bedroom to turn the lights off and the TV off. Her son then came in the room. At that time, then, I noticed another large black, looked like a black plastic suitcase in the closet. I asked the small child, I said, "Whose suitcase is that?" He said, "That's ... Chris put it in there." And I didn't go any farther questioning him on that.

Q   Detective Early, Ms. Robinson at this residence, from what you observed, would you expect that she's been living there for some time as far as clothes hanging in her closet, the residence looking lived in?

A   Yes. And she made the comment she had lived there for a couple months.

Q   So the suitcases would certainly be out of place in that context?

A   Yes.

Tr. 22–23. At the end of the second probable cause hearing, the court found probable cause for a search of Debra Robinson's residence for cocaine, crack cocaine, currency, and other items used in the distribution of cocaine. Tr. 32. The search turned up large quantities of cocaine.

Debra Robinson does not challenge the "stop and knock" in the morning. She bases her motion to suppress primarily on Early's testimony about the "walk through" when she was arrested. She contends that when the police came to her home to arrest her on the arrest warrant,

and after they had actually taken her into custody (without having to search the house for her), they had no basis for "walking through" the house to see what else or who else might be there. It was during the "walk through" that the police spotted the suitcases that were critical to the finding of probable cause for the search warrant, which turned up the incriminating evidence.

Debra Robinson also contends that the evidence before Judge Carroll failed to establish a sufficient connection between herself and the suitcases, on the one hand, and their possible use for transporting cocaine or cash, on the other hand. This argument is readily rejected. Using a common sense approach toward all the evidence that had been presented at both hearings, the judge could and did make a practical judgment that there was a reasonable probability that the suitcases in Debra Robinson's house were connected to the cocaine trafficking operation. See generally *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (probable cause depends on practical, common sense judgment based on all relevant circumstances).

When the court made that judgment, it was supported by the general picture of the distribution operation's methods, as well as by evidence of a relationship between Harris and Debra Robinson, including the registration of the car he was driving when arrested, the earlier interdiction of $125,000 in cash that Debra Robinson had been carrying to California, evidence that Harris had recently received a shipment of cocaine, and the boy's statement to police at the house that "Chris put them [the suitcases] there." The suitcases also appeared out of place in the house, not as if they were being stored or taken out of storage for a trip.

■ Debra Robinson's principal argument, based on the discovery of the suitcases during the "walk through" at the time of her arrest, presents a closer question. The police had a warrant to arrest Debra Robinson but no warrant to search

her home at that time. The "walk through" was not as intrusive as a top-to-bottom search, but it was a search, nevertheless. Warrantless searches inside homes are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The police clearly could not have searched her house thoroughly at that time. See *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

■ When the police execute a lawful arrest in a residence, they may carry out a "protective sweep" if they have a reasonable, articulable suspicion that the residence is harboring a person who poses a danger to those on the scene of the arrest. *Maryland v. Buie*, 494 U.S. 325, 336, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). Such a protective sweep is limited to a "quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others," that is "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* at 327, 110 S.Ct. 1093. The protective sweep is permitted under the general standard of reasonableness that governs all Fourth Amendment issues. *Id.* at 331, 110 S.Ct. 1093; see also, *e.g.*, *Cady v. Dombrowski*, 413 U.S. 433, 439, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) (the ultimate standard set forth in the Fourth Amendment is reasonableness). The scope of a protective sweep is limited to the purpose that makes it reasonable: determining whether there is an immediate threat to the safety of those on the scene. See generally *United States v. Burrows*, 48 F.3d 1011, 1015–18 (7th Cir. 1995) (discussing scope and limits of a "protective sweep" incident to a lawful arrest).

■ The government has not tried to justify the "walk through" in Debra Robinson's house as a "protective sweep." The government's argument in this case, however, closely parallels the reasoning of *Maryland v. Buie* and the protective sweep cases. The government contends that two factors justified the brief "walk through"

in connection with the arrest of the only adult in the house: the presence of a young child in the house, and the fact that lights and appliances were on. In essence, the government argues that the "walk through" was reasonable as a measure to locate and assure the safety of the child the officers believed was present, as well as to secure the house itself from possible damage from appliances. The protective sweep cases permit reasonable measures to protect the safety of officers; the government argues the "walk through" in this case was a reasonable measure to protect the safety of a child and home.

The court has no doubt that when the task force officers looked in other rooms, they were interested in more than saving on electric bills and providing for the welfare of Debra Robinson's son. That much is evident from the not-so-idle question to the boy about whose suitcase it was. The record here is very limited about the circumstances of the arrest and the "walk through." The evidence is limited to the transcript of the officer's brief account during the second probable cause hearing. Debra Robinson did not testify; Detective Early was not cross-examined. The limited record does not provide details about the scope and duration of the "walk through" or other circumstances that might be material to whether the search was reasonable or unreasonable, such as the arrangements the police made for the care of Debra Robinson's son.

The bedrock issue under the Fourth Amendment is reasonableness. The government can point to *some* evidence tending to show that the "walk through" was reasonable under the circumstances. Based on the earlier "stop and knock," when the police arrived to arrest Debra Robinson, they had reason to expect that the boy might be present in the house. It is easy to imagine the criticism (and possible legal claims) that could be leveled at police who arrested the only adult in a house and left a minor child alone, at least so long as they had reason to think he might be there. It is also easy to imagine the criticism and possible legal claims that could arise if, for example, a stove, oven, iron, or other appliance had been left on as

the police departed with the only adult in the house. Combine a child left alone and unattended appliances, and the risks are evident and greater.

Other federal courts have recognized in comparable circumstances that a quick, warrantless search of limited scope may be reasonable to protect the safety of children or others in a home. For example, in *In re Sealed Case 96–3167*, 153 F.3d 759 (D.C.Cir.1998), the court held that police officers had reasonably entered a house without a warrant when they saw a man appear to break into it at night. After arresting the man inside the house (which later turned out to be his own house), the officers checked other rooms. In a small bedroom, the officers saw white rocks and a triple-beam scale. The rocks turned out to be crack cocaine. The District of Columbia Circuit upheld the look in the small bedroom as part of a protective sweep and also found that the officers might also have been justified in looking in the small bedroom to look for children or other victims of the suspected burglary. *Id.* at 770, citing *Mincey v. Arizona*, 437 U.S. 385, 392–93, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (police may enter home without a warrant in emergency situations where they reasonably believe a person may need immediate assistance, and the scope of the search is limited to that purpose). See also *Tierney v. Davidson*, 133 F.3d 189, 198–99 (2d Cir.1998) (reversing denial of qualified immunity in civil rights action; it was reasonable for police investigating domestic disturbance to make a quick visual search of rooms in the house to protect safety of people on the premises, including children); *Murdock v. Stout*, 54 F.3d 1437, 1442 (9th Cir.1995) (warrantless entry valid when officers believed resident in danger or injured; resident did not respond although circumstances inside house suggested resident should have been present, and officers had earlier report of suspicious activity); *United States v. Antwine*, 873 F.2d 1144, 1145–47 (8th Cir.1989) (approving warrantless entry and search of house because of concern about safety of

children remaining inside); *United States v. Al–Azzawy*, 784 F.2d 890, 895 (9th Cir. 1985) (approving warrantless search of residence for firearms and explosives in connection with arrest where others on scene, including small children, were entitled to return to the residence).

These cases do not directly control this case, but they support the view that an intrusion of limited scope, such as the "walk through" that occurred here, may be reasonable for purposes other than the officer safety purpose of the protective sweep in *Maryland v. Buie*. The safety of others in the residence is also a reasonable consideration for the police, as the Supreme Court recognized in *Mincey v. Arizona*. This court is most certainly not saying that police officers executing an arrest warrant at a residence have unlimited powers to conduct a "walk through" of the residence as a matter of routine, regardless of the circumstances. In this case, however, based on the limited record showing that police were arresting the only adult in the residence where a child was present and appliances were on, and where there is no indication that the police did anything more intrusive than look quickly in other rooms, the court finds that the government has satisfied its burden of showing the search was reasonable. Debra Robinson has not rebutted the government's case. She has not come forward with evidence showing that the "walk through" was unreasonable under these circumstances. Debra Robinson's motion to suppress is therefore denied.

### III. *Adrena Robinson's Motion to Suppress*

Timing is everything. After the police arrested Debra Robinson at her house, some officers prepared to go back to Judge Carroll to seek the search warrant for her house. Other officers stayed on the scene to secure it. As some of the officers were preparing to go to court to request the search warrant for Debra Robinson's house, Adrena Robinson arrived at Debra's house in a car. She was carrying two large suitcases from the car to the house when she was stopped by drug task force officers. Tr. 27. Adrena Robinson was detained at that point so that a police dog could sniff the suitcases from the outside.

While Detective Early and others were meeting with Judge Carroll at about 10 p.m. to obtain the search warrant for Debra Robinson's house, they were contacted by the officers on the scene with Adrena Robinson. The officers relayed the information that the police dog had given a positive indication of drugs after sniffing the suitcases Adrena Robinson had carried up to the house on Dover Street. At the request of the officers, therefore, the judge added in handwriting to the typed search warrant: "Warrant enlarged to include search of luggage in possession of Adrena Robinson." The police executed the search warrant and discovered a large quantity of cocaine in the luggage.

Adrena Robinson argues that the search warrant was not supported by probable cause and was not sufficiently particular in describing the scope of the search. She also contends that the search warrant was invalid because the judge who issued it did not act as a neutral and detached decisionmaker, but as an "adjunct law enforcement officer."

As with Debra Robinson's motion to suppress, the only evidence in this record on Adrena Robinson's motion to suppress is the transcript of the probable cause hearings before Judge Carroll. A lengthy excerpt provides all the relevant evidence concerning Adrena Robinson:

Q Were canine [sic] brought in for the suitcases [at Debra Robinson's house], Det. Early?

A Not suitcases in the house. While we were in the process of getting the search warrant, we were contacted by Det. Cole who we left at the house. He called and said that Debra Robinson's sister [Adrena] had arrived at a vehicle and had told Det. Cole that she just got back in town from California. Somewhere

in her vehicle he saw two large suitcases. At that time our canine officer was going out to stand by for the search warrant to do the drug sniff. I believe the canine did a sniff of the car or packages, I'm not sure, and had a hit on the car.

Det. Brooks: The infor ... Your Honor, the information was ... Sgt. Ash just advised me he spoke to Det. Cole, and that the sister who identified herself as being Deborah's sister carried the luggage up to the house. That's when she was stopped by [drug task force]officers asking, identifying her. She advised she just got back from California. That's when we called for a ca ... She refused permission to search her vehicle. That's when the canines came out and did a sniff, and they have indicated positive on the items.

Q    Det. Early, the incidents that you've described here, when was that today? About what time?

A    Approximately 9:00 p.m.

Mr. Williams [prosecutor]: I don't have any other questions, Judge.

The Court: So this request is to search the premises at 2038 Lafayette Street and specifically to take into possession, I assume, those suitcases and whatever else you find, but the suitcases particularly interest you to see if there's cocaine residue, instruments for weighing, measuring, packaging and so forth in connection with that luggage. The luggage is the principal thrust of your inquiry at the moment?

Mr. Williams: That's correct.

The Court: And what's going on with the vehicle of the sister?

Det. Brooks: As we were waiting to come here to attempt to get a search warrant, the sister showed up, and she was walking into the house. That's when when ... not allowing her to be in the house as we're securing the residence until we get ... She has offered . . .

The Court: So she's just cooling her heels or something? You don't know?

Det. Brooks: That's correct. She just admitted that she just got back from California which our further investigation she, could be related.

The Court: Okay.

\*      \*      \*      \*      \*      \*

Mr. Williams: The concern that we would have, Judge, of course is the one that you just raised. The search warrant was prepared, and then in the meantime the vehicle [with Adrena Robinson] showed up. The same information that's been provided would also apply to the vehicle, but that's not set forth in the search warrant, so I'm not sure how you would want us to proceed on that.

The Court: Well, I'm wondering ... We want to be sure there's probable cause, but on the other hand, we don't want to make another trip up here unnecessarily, and I'm trying to anticipate that.

Mr. Williams: Right.

The Court: And I'm wondering if an appropriate ... It's your impression, Det. Early, that the canine unit has already been at the vehicle?

Det. Early: I was wrong. The, according to Sgt. Ash, the lady who drove the vehicle there got out of the vehicle with two large suitcases, was in the process of carrying those suitcases up to the house when she was stopped by [drug task force] officers.

The Court: Okay.

Det. Early: The canine, I believe, has just made an outside sniff of the suitcases that she was carrying up to the house.

The Court: Of the suitcases?

Det. Early: Yes, sir.

The Court: Okay. And that was a positive?

Det. Early: Yes, sir.

The Court: And so is she being detained while this [is] going on or ...

Det. Early: Yes.

Det. Brooks: Yeah. We just spoke ... Sgt. Ash just spoke to Sgt. Sieg, our canine officer, and he is informed that the dogs did have a hit on the luggage at which point she's being detained until further, until we can come here and see what the situation ...

The Court: The record's not clear about this. I know who Sgt. Sieg is. He's also a canine officer, and he has a canine who's been trained for this purpose and whose work has often proved useful.

Det. Brooks: That's correct.

The Court: And consistently is used for purposes such as this to sniff around vehicles or luggage or whatever it is, and because of the dog's training—gives a particular bark or raises his paw or whatever he does when it's a hit and otherwise he doesn't. What does he do?

Det. Brooks: He sits.

The Court: Rolls over? I don't know. But he does something.

Det. Brooks: He sits.

The Court: And so when you say that's a positive hit, that means the dog has communicated that there is cocaine or some other illegal substance.

Det. Brooks: Yes.

The Court: And so are we wondering out lou ... The record's running, but I can't see any reason why we can't just wonder out loud. You're wondering out loud about the suitcases or about the car or about both?

Mr. Williams: Both. The suitcases I don't have much concern with since that's consistent with the entire story you've heard today. The dogs have hit on it. I guess what I'm wondering out loud about is the vehicle. She's indicated that she just came from California. That's where the luggage came from. She just got that out of the car.

The Court: And they observed her bring the luggage out of the vehicle.

Mr. Williams: The car, right. And stopped her right there, so ... But the search warrant doesn't set forth the vehicle, but certainly we would be asking for, based upon the same record permission to search the vehicle.

The Court: I think that's a reasonable request, and so I think what probably the most efficient way is I'll just handwrite on a couple of these copies that the warrant is enlarged to include suitcases in the possession of ... You know her name? Deborah Robinson's sister?

Det. Brooks: Catrice ...

The Court: Do you have the ability, if we close the record for a second and come back on, to find out who it is, and why don't you get a plate number or something about the vehicle, and we'll just come back on and finish the record.

\*     \*     \*     \*     \*     \*

The Court: We were off the record just for a moment, and Det. Early made the ... I don't know if it was radio traffic or it was telephone call, but somehow he made contact with officers on the scene, and I think has some additional information to report about whose luggage this is that's at the scene on Lafayette Street. Detective?

Det. Early: Yes. The girl that arrived with the luggage, her name is Adrena Robinson.

The Court: And it's your information that that's the sister of Deborah Robinson?

Det. Early: Yes.

The Court: And it's Adrena Robinson who told you she just came from California.

Det. Early: Told officers at the scene.

The Court: Told officers at the scene that she came from California, and she's carrying suitcases.

Det. Early: Yes, sir.

The Court: And your request, Mr. Williams, as I understood it from before, is to enlarge this warrant to include the opportunity to search that luggage which is in Ms. Robinson's possession?

Mr. Williams: That's exactly right, Judge.

The Court: All right.

Mr. Williams: When the search warrant was being completed is when Adrena Robinson arrived, and that's why the search warrant didn't contain that language, but that's exactly right.

The Court: [After finding probable cause for search of 2038 Lafayette Street]: The warrant is also enlarged to include the search of luggage now at that location brought by Adrena Robinson, and I've made a handwritten note on the warrant to that effect. All as per written warrant issued this date. Record closed.

Tr. 23–32.

Adrena Robinson's first argument, that the search warrant was not specific enough, is not persuasive. The handwritten notation on the search warrant: "Warrant enlarged to include search of luggage in possession of Adrena Robinson," was sufficiently particular. See *Maryland v. Garrison*, 480 U.S. 79, 84–85, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987); *United States v. Jones*, 54 F.3d 1285, 1292 (7th Cir.1995). There is no serious suggestion of ambiguity under the circumstances, nor is there any suggestion that the officers executing the warrant for the luggage overstepped the bounds of the warrant.

▪ Adrena Robinson also argues that the record does not show probable cause for issuing the search warrant for her luggage. The court assumes that her mere arrival on the scene with luggage was not sufficient to support a search warrant for luggage. The critical piece of information to support the search of her luggage was the positive indication from a police dog. Adrena Robinson argues that the record shows only fragmentary and unreliable information concerning the police dog and any signal it might have given, so that probable cause was lacking. She cites *United States v. Klein*, 626 F.2d 22, 27 (7th Cir.1980), where the Seventh Circuit upheld a search warrant based on a police dog indication, but where the record was more specific than this one concerning the police dog's training and the reliability of the positive signals.

The transcript of the probable cause hearing shows a quickly evolving situation as the officers who were with the judge in the hearing received additional information from officers back on the scene. The initial version the officers gave to the judge was corrected as they received more detailed information, presumably by radio, from the officers on the scene. Two points are critical here. First, the record shows clearly that, after some initial confusion, the judge received information from the officers that a police dog had given a positive signal for the presence of illegal drugs in the suitcases that Adrena Robinson had just brought to Debra Robinson's house. Second, Adrena Robinson and the other defendants have not shown that the positive signal came from a dog with a poor record of accuracy or a lack of training, nor have they shown that the police misled the judge about any facts or circumstances.

Federal courts have occasionally grappled with just how much information must be provided to a judge to support issuance of a search warrant on the basis of a police dog's signal after sniffing the intended target of the search. In *United States v. Klein*, the Seventh Circuit held that a search warrant was supported by probable cause where the judge was told the dog had graduated from training class and had proven reliable in detecting drugs on prior occasions. 626 F.2d at 27. Adrena Robinson argues that the information here fails to satisfy the standard set in *Klein*, but *Klein* did not hold that the showing made in that case was the bare minimum. The court held only that the record there was sufficient to support a search warrant.

▪ In *United States v. Kennedy*, 131 F.3d 1371, 1376–77 (10th Cir.1997), the Tenth Circuit collected cases on the subject and stated: "As a general rule, a search warrant based on a narcotics canine alert will be sufficient on its face if the affidavit states that the dog is trained and

certified to detect narcotics." Appellate courts have generally rejected arguments that detailed information about the dog's training, certification, or accuracy record must be included in the affidavits or information presented to the judge. See *United States v. Berry*, 90 F.3d 148, 153 (6th Cir.1996) (affidavit's reference to dog as a "drug sniffing or drug detecting dog" reasonably implied that the dog was a trained narcotics detection dog); *United States v. Daniel*, 982 F.2d 146, 151 & n. 7 (5th Cir.1993) (statement that dog was trained to detect presence of controlled substances was sufficient to show probable cause); *United States v. Venema*, 563 F.2d 1003, 1007 (10th Cir.1977) (statement that dog was "trained, certified marijuana sniffing dog" was sufficient to show probable cause); *United States v. Meyer*, 536 F.2d 963, 966 (1st Cir.1976) (statement that dog was "trained" to detect drugs was sufficient to show dog's reliability without more detailed information).

In this case the information about the dog's sniff of the suitcases was presented orally, not by affidavit. After some confused and garbled information, Detective Brooks told the judge that Sergeant Sieg, "our canine officer," had told Sergeant Ash, who relayed the information to Detective Brooks, that "the dogs did have a hit on the luggage." Tr. 28. The judge then made a conscious effort to state on the record the information that all present already seemed to know. The judge confirmed with Detective Brooks that Sergeant Sieg had a dog that had been trained to detect controlled substances and that the dog's work "has often proved useful." *Id.* The judge also had Detective Brooks confirm that a "positive hit" means "the dog has communicated that there is cocaine or some other illegal substance." *Id.* at 29. With that record, and in the absence of evidence that the police foisted off an untrained or unreliable dog on the judge, this court finds that the search of Adrena Robinson's luggage was supported by probable cause. The fact that the information was relayed through one or two other police officers does not undermine the foundation for the search warrant. When deciding whether to issue a search warrant, a judge may consider "hearsay" relayed from one police officer to another.

■ Adrena Robinson also argues that the search warrant should be held void on the theory that the judge did not act as a neutral and detached magistrate, but instead "testified" and acted as an "adjunct law enforcement officer." A magistrate who fails to " 'manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application' and who acts instead as 'an adjunct law enforcement officer' cannot provide valid authorization for an otherwise unconstitutional search." *United States v. Leon*, 468 U.S. 897, 914, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), quoting *Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 326–27, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979). No matter how routine a request for a warrant may seem, a judge who considers the application plays a vital role under the Fourth Amendment. The judge's role is not to help the police or to "join the team," but to consider the request from a neutral viewpoint, recognizing how intrusive, disruptive, and sometimes even dangerous the execution of a search warrant can be.

■ Adrena Robinson bases her argument on the judge's statements and questions dealing with the police dog's signal on the suitcases, as well as the judge's earlier comment: "We want to be sure there's probable cause . . . ." at page 27 of the transcript. This court is not persuaded.

Regarding the police dog, it is not surprising that the experienced judge was already familiar with the Anderson Police Department's canine unit. The judge also recognized the need to make an adequate record on the oral information provided to him in such an impromptu fashion. The passages that Adrena Robinson criticizes as the judge's "testimony" show, in this court's view, only leading questions to the witness needed to put on the record the

essential information that the officers were taking for granted. Detective Brooks confirmed the judge's statements, just as any witness who answers "yes" or "that's correct" to a leading question does. At least in the absence of objections, this court has allowed lawyers to provide similar "testimony," at least so long as there is a witness in the chair who confirms under oath that what the questioner says is true. The leading questions did not transform the judge into a witness or an advocate.

The judge's statement that "We want to be sure there's probable cause" also does not show the court had lost its neutral perspective. This court reads the statement as nothing more insidious than a judge's use of a judicial "we," and there is no reason to believe the judge did not implicitly add "before we issue a search warrant." The transcript as a whole shows that the judge repeatedly questioned the police officers to probe the details of their case for probable cause. It should also be noted that the police were asking for a search warrant for a search of the car Adrena Robinson drove to Debra Robinson's house. The court did not authorize a search of the car. In sum, therefore, the police did the right thing by going to the court to seek a search warrant for Adrena Robinson's luggage, and the court fulfilled its role and made a reasonable, common sense judgment authorizing a search of the luggage.

### Conclusion

Accordingly, Defendant Chris Harris's motion to dismiss the superseding indictment is hereby denied, and the motions to suppress filed by defendants Debra Robinson and Adrena Robinson are also denied.

So ordered.