In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1148

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FERNELL A. STARNES,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 3:09-cr-50015-1 — **Frederick J. Kapala**, *Judge.*

ARGUED NOVEMBER 8, 2013 — DECIDED DECEMBER 23, 2013

Before POSNER, ROVNER, and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* After receiving citizen complaints of
drug trafficking, the Rockford Police Department arranged an
undercover controlled purchase of crack cocaine from a lower
level apartment at 922 North Church Street in Rockford,
Illinois.[1] Three days later, the police secured a warrant to

---

[1] As we recite the facts in this case, it occurs to us that this is a good time
to remind the bar that judges, like most other people, prefer to read briefs

(continued...)

search "922 N. Church Street lower apartment, Rockford Illinois." The warrant described the premises to be searched as a "two story, two-family dwelling, white with black trim, located on the west side of street with the numbers '922' appearing on the front of the residence with lower apartment being located on the ground floor." The lower apartment was actually the lower level of a two-story house that had been converted from a single family residence into a two-flat.

The police knew that they would be facing two obstacles when they executed the search. The first was that mere hours before the planned raid, a shooting occurred at the residence. Police officers conducting raids assume that drug dealers are armed (and the assumption is generally correct, as weapons are a necessary tool of the drug trade. *United States v. Gulley*, 722 F.3d 901, 908 (7th Cir. 2013)), but the recent shooting increased the risk that the weapons were loaded and ready and the possessors of those weapons were agitated and on high alert. The police officers also knew that two aggressive pit bulls lived on the premises.

---

[1] (...continued)
written in straightforward, plain language and not legalese. Beginning each sentence with the word "that" or preceding each previously described concept with the word "said," and other oddities stereotypically associated with lawyers, disrupts the flow of a brief and thus weakens its impact. The same is true when a brief recites the facts by describing each witness' testimony piecemeal rather than by telling a story chronologically. As judges we are able to divorce the distracting text from the content in evaluating a case, but the role of a prudent advocate is to make the court's job easier, not more difficult. There are many illuminating books on writing effective briefs and every practitioner before this Court would be wise to invest a few hours in reading one.

After knocking on the front door of the house and receiving no response, investigators forced their way into the building. The first officer to enter the house found himself in a small foyer with two open doors. One door led to the first floor apartment. The other door led to an initial set of ascending stairs, four or five of which were visible before they turned at a landing. The office immediately encountered a pit bull who initially turned and ran away from the officer, through the open door to the stairway, and up a few steps toward the upper apartment, before altering course and charging toward the officer. The officer shot and killed the dog on the first landing and then proceeded up those same stairs to perform a protective sweep of the upper apartment. As he ran through the kitchen of the upper apartment, he noticed on the counter various mixing bowls, several large chunks of an off-white substance, some scales and rubber gloves. In the bedroom he discovered the defendant, Fernell Starnes, and a woman in bed. The officer detained Starnes and the woman and escorted them downstairs. Other officers then left to seek a second warrant to search the upstairs apartment, leaving one officer behind at the bottom of the stairs to prevent anyone from entering the apartment.

While some officers were seeking the second warrant, other detectives searched the lower apartment (for which they already had a warrant) and seized two semi-automatic rifles, two loaded ammunition magazines, a loaded .45 caliber semiautomatic hand gun, and drug trafficking paraphernalia. After executing the search warrant on the second floor, the officers seized Starnes' photo identification cards, approxi-

mately 290 grams of cocaine, 72.5 grams of cocaine base, $36,186 in cash, and more drug trafficking paraphernalia.

The government charged Starnes with possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1) and possessing a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A). Starnes moved to suppress the evidence seized from the second floor after the execution of the second search warrant. After an evidentiary hearing, the district court denied the motion to suppress. Eventually Starnes entered a guilty plea but reserved his right to challenge the denied motion. The lower court sentenced Starnes to serve consecutive sentences of 63 months on Count 1, and 60 months on Count 2. He now challenges the district court's ruling on the motion to suppress, arguing that the evidence seized from the upper apartment could not be considered because investigators initially entered the apartment without a warrant or any other lawful reason to enter.

We review de novo a district court's legal conclusion that the police acted reasonably in performing a protective sweep. *United States v. Tapia,* 610 F.3d 505, 510 (7th Cir. 2010). And we review factual questions for clear error. *United States v. Delgado*, 701 F.3d 1161, 1164 (7th Cir. 2012). Questions about whether the particular circumstances supported a warrantless search often involve mixed questions of law and fact, which we review de novo. *Id.*

Our analysis starts with the presumption that warrantless searches and seizures within a home violate the Fourth Amend-

ment's prohibition against unreasonable searches and seizures unless they fall into one of the numerous exceptions, including protective sweeps. *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011). A protective sweep is a quick and limited search of premises conducted to protect the safety of police officers or others. *Maryland v. Buie*, 494 U.S. 325, 327 (1990). Under certain circumstances such a sweep is permissible because legitimate governmental interests outweigh an individual's interest in the protection of the Fourth Amendment. *Id.* at 331. In general, the Fourth Amendment permits a protective sweep

> if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others.

*Id.* at 327 (internal citations omitted); *Tapia*, 610 F.3d at 510, *Leaf v. Shelnutt*, 400 F.3d 1070, 1086 (7th Cir. 2005). The sweep must also be justified by more than a "mere inchoate and unparticularized suspicion or hunch," regarding the danger. *Buie*, 494 U.S. at 332, *Tapia*, 610 F.3d at 510. The search must be cursory, lasting no longer than is necessary to dispel the reasonable suspicion of danger. *Buie*, 494 U.S. at 335–36; *Tapia*, 610 F.3d at 510. It must also be limited to a cursory visual inspection of places where a person might be hiding. *Buie*, 494 U.S. at *327; Tapia*, 610 F.3d at 510.

The inquiry is an exceptionally fact-intensive one in which we must analyze myriad factors including, among other considerations, the configuration of the dwelling, the general

surroundings, and the opportunities for ambush. *United States v. Burrows*, 48 F.3d 1011, 1016 (7th Cir. 1995). An ambush in a confined setting of unknown configuration is just such a situation in which an officer might need to perform a protective sweep. *Buie*, 494 U.S. at 333, *Tapia*, 610 F.3d at 511.

In this case there were many other substantial, particularized factors that would allow a reasonable officer to conclude that he, his fellow officers, or another bystander might face danger. First, the officers had reliable information that drugs were being sold from the lower unit of the house and that a shooting had occurred on the premises just a few hours prior. The officers had also been informed that there were two aggressive pit bulls on the premises and that only one had been subdued. The doors to both the second floor and first floor apartments were open, and the two apartments had been carved out of a former single family home. In fact, it appeared to some of the officers as though the home might be being used as one unit (and indeed, it turns out that it was). Moreover, the police could not have known for certain whether there were other points of access between the two units, such as a back staircase or a fire escape, and whether, therefore, a dangerous dog or person might be moving between the two units. In fact, the aggressive dog initially ran toward the upstairs apartment indicating that the dog might be protecting someone on the upstairs floor. Finally, because one of the detectives was forced to fire multiple shots at an attacking dog immediately after entering the house, the officers knew that any occupants quickly would have been alerted to their presence by the gunfire.

Furthermore, the search itself appears to have been short, cursory, and limited to only those places that a person might be hiding. *See Buie*, 494 U.S. at 335–36. The sweeping officer ran through the apartment looking briefly into the bathroom, the kitchen, and the bedroom. He did not need to open any cabinets or drawers or touch anything to see the suspicious looking white substance and drug-selling paraphernalia on the kitchen counter. Once the police discovered Starnes and his companion, they secured and removed them immediately and vacated the upper unit. In the meantime, all of the police officers remained outside of the second-floor apartment until the court issued the warrant. One police officer was stationed at the landing of the ascending stairs to ensure that no one entered.

This case is the fraternal twin of our decision in *Tapia*, 610 F.3d at 505. In that case, the Rockford police approached the residence of a drug dealer and convicted felon armed with a warrant to arrest, but not search. Upon arriving at the house, the police noticed another gang member's vehicle parked in the driveway. After a few minutes of knocking on the front door, a police officer stationed at another location outside the house noticed that someone had just exited the basement. Moments later, having walked out of the basement stairwell and through the living room, the defendant, Tapia, opened the front door. The police arrested Tapia and performed a protective sweep of the rest of the residence, including the basement where Tapia had been, and discovered a gun. Just as the police did here, the Rockford police returned with a search warrant to conduct a complete search of the house. Due to the discovery of the gun, the government charged Tapia with being a

felon in possession of a firearm. Tapia, like Starnes, moved to suppress the evidence of the gun, arguing that the protective sweep of the basement was unreasonable. *Id.* at 507–08.

Just as is the case here, the holding in *Tapia* was very much fact-dependent. The court concluded that the officers had reason to believe that other gang members could be present at the house and pose a threat to officers. The conclusion was supported by the following facts: Tapia was the leader of a gang and on parole for a 2005 unlawful use of weapons conviction; he was living in the basement of the residence with other gang members; Tapia's gang and rival gang members had recently been shooting at each other on nearby streets; there was a Lincoln Navigator in the driveway which the police thought belonged to a fellow gang member and was large enough to hold five or six people; Tapia emerged from the basement. The court concluded that the officers had reason to believe that armed gang members could be in the basement and therefore might pose a threat to the police.

The *Tapia* court specifically rejected the defendant's argument that the officers could have adequately protected themselves simply by guarding the basement door. Similarly, in this case the district court determined that there was good reason to believe that securing the door to the second floor apartment without doing a protective sweep may not have been effective and could have subjected the officers to ambush.

In Tapia we relied heavily on another fact-intensive finding in the seminal case of *Buie*. In *Buie*, two men—one wearing a red running suit—committed an armed robbery. The officers eventually secured an arrest warrant for Buie and after

confirming that he was home, entered the house to arrest him. Once inside, several officers fanned out through the first and second floors. One officer stood at the top of the basement stairs and ordered anyone hiding there to come out. Eventually Buie emerged and was arrested. A second officer entered the basement and performed a protective sweep to ensure that no one remained hidden. While there, he noticed a red running suit in plain sight on a stack of clothing. Recognizing the risk of ambush, the Supreme Court announced the holding that carries the day today:

> The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene.

*Buie*, 494 U.S. at 337.

Starnes argues that *Buie* and *Tapia* can be distinguished as they both addressed protective sweeps incident to an arrest in a home rather than the execution of search warrant. The philosophy behind a protective sweep, however, remains the same regardless of how the officers arrived in the home. When officers enter the residence of a criminal suspect and have reason to believe that a particular area might harbor an individual (or as in this case, an individual and an animal) who poses a danger to the officers or others, the Fourth Amendment permits a quick and limited protective sweep. As the Supreme Court reasoned, officers who are in a criminal suspect's home face the disadvantage of being on an adversary's turf and

subject to ambush. Thus the constitutionality of a protective sweep does not depend on whether that sweep is incidental to a search warrant, an arrest warrant, or a consensual search. *See e.g. Leaf*, 400 F.3d at 1087. *See also, United States v. Werra*, 638 F.3d 326, 350-351 (1st Cir. 2011) (stating that a protective sweep is proper whether an arrest warrant, a search warrant, or exigent circumstances prompt the agent's entry); *United States v. Caraballo,* 595 F.3d 1214, 1224 -1225 (11th Cir. 2010) (holding that once legally on board a boat due to probable cause and Florida marine law, marine officers could perform a protective sweep); *United States v. Gould*, 364 F.3d 578, 593 (5th Cir. 2004) (allowing protective sweep pursuant to consent entry) (*abrogated on other grounds by Kentucky v. King*, 131 S. Ct. 1849, 1861 (2011)); *United States v. Taylor*, 248 F.3d 506, 513 (6th Cir. 2001) (approving protective sweep by officer left behind while warrant was sought after officers initially entered with consent); *United States v. Garcia*, 997 F.2d 1273, 1282 (9th Cir. 1993) (permitting protective sweep pursuant to consent entry); *United States v. Patrick*, 959 F.2d 991, 996–97 (D.C. Cir.1992) (upholding a protective search where police were lawfully on premises pursuant to consent) (*abrogated on other grounds by Apprendi v. New Jersey*, 530 U.S. 466 (2000)). What matters are the specific facts that would give a reasonable officer, who is lawfully inside a home, a "reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[] the officer in believing that the area swept harbored an individual posing a danger to the officer or others." *Buie*, 494 U.S. at 327 (internal citations omitted).

Starnes' arguments about inconsistencies in the detectives' description of the protective sweep and its rationale are irrelevant. As long as the officer had a reasonable belief of the danger, based on specific articulable facts, any inconsistencies in his reporting do not matter. *See Id.* at 327. As we noted above, a bevy of facts supports the conclusion that such a sweep was reasonable and prudent. In any event, the district court found credible the detective's explanation that he swept the upper apartment for potential threats and that the search constituted a protective sweep irrespective of the fact that his report did not use this precise term. We give special deference to the district court's determinations of credibility. *United States v. Groves*, 530 F.3d 506, 510 (7th Cir. 2008). We see no reason to upset the district court's rational and well-reasoned findings on these facts if such findings were indeed necessary.

We continue to recognize that "the sweep is a device that can easily be perverted to achieve ends other than those acknowledged as legitimate in *Buie*." *Burrows*, 48 F.3d at 1017. This opinion neither expands nor contracts law enforcement's right to perform such a sweep. Regardless of the context of an officer's entry into a home, the same concise standard announced in *Buie* stands:

> The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene.

*Buie*, 494 U.S. at 337.

The judgment of the district court is affirmed.