In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-2843

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARCUS HENDERSON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:11-cr-00007-RLM-1 — **Robert L. Miller, Jr.**, *Judge.*

ARGUED DECEMBER 12, 2013 — DECIDED APRIL 15, 2014

Before BAUER, CUDAHY, and POSNER, *Circuit Judges.*

BAUER, *Circuit Judge.* Marcus Henderson ("Henderson")
was indicted for being a drug user in possession of firearms
in violation of 18 U.S.C. § 922(g)(3). Prior to trial, the district
court judge denied Henderson's motion to suppress evidence
seized during a protective sweep of his home. A jury found
Henderson guilty, and the district court judge sentenced him
to thirty-nine months' imprisonment, followed by three years'
supervised release, and the payment of a $100 special assess-

ment. On appeal, Henderson contends that the firearms were discovered pursuant to an unconstitutional search because the protective sweep of his home was unreasonable. For the reasons that follow, we affirm.

## I. BACKGROUND

In the early morning of September 19, 2010, the South Bend Police Department responded to a domestic disturbance call from Terrence Winfield ("Winfield"). Winfield reported that Crystal Davis ("Davis"), his ex-girlfriend, was being held against her will at the house of defendant Henderson. Sergeant Wolff met Winfield across the street from Henderson's house, where Winfield showed Sergeant Wolff text messages on his cell phone from Davis. From Sergeant Wolff's perspective, the texts were from an unknown female. Sergeant Wolff described the information he saw on Winfield's cell phone as "several texts on it from this female stating generally that she was being held there, she could not get out of the house, made references to Henderson being dangerous and [that] he had weapons in the house." Sergeant Wolff responded to those text messages two-fold: he took steps to confirm that the woman sending the texts was actually in Henderson's house and he called the commander of the South Bend SWAT team to report a possible hostage situation.

Sergeant Wolff then set up a perimeter of police officers and spotlighted the doors, windows, and exterior of Henderson's home. Several officers saw movement in the house when a curtain was pulled to one side by someone inside the house; the person was not identified, but the officers suspected that it was Davis. Sergeant Wolff spoke again with Winfield who

continued to receive new texts from Davis. Sergeant Wolff remembered seeing a text that said, "he's got the door bolted, I can't get out." The officers did not attempt to establish direct contact with Davis, but set up a PA loudspeaker to establish contact with Henderson. The officers demanded that Henderson exit the house. A standoff lasted for over an hour.

About fifteen minutes after the SWAT team arrived and surrounded the house, Davis stepped out of the house in tears. She was taken to a police command post where Davis told her story to a South Bend police officer. The officer recorded the conversation on the squad car's video camera; the statement described how she could not leave because all the exits had keyed deadbolts and the keys were in Henderson's possession. She explained that she had known Henderson for at least twenty-five years and went to his house the previous night on her own accord. However, according to Davis when she wanted to go home, Henderson threatened her by displaying a handgun and telling her that she was not going anywhere.

Fifteen to thirty minutes after Davis exited, Henderson voluntarily came out of the house and locked the door behind him. The officers handcuffed Henderson, took him into custody, and searched him; the officers did not find any weapons in Henderson's possession.

Approximately five to ten minutes after his arrest, the officers took Henderson's keys and attempted to open the front door. Unable to unlock the front door, the SWAT team forced entry through the back door and conducted a brief protective sweep of the house. They did not find anyone else in the house,

but they saw remnants of a marijuana grow operation and firearms in plain view. The sweep lasted five minutes or less.

After the sweep, the South Bend Police Department obtained a search warrant for Henderson's residence and found crack cocaine, powder cocaine, marijuana, and five firearms.

The government charged Henderson with being a drug user in possession of firearms in violation of 18 U.S.C. § 922(g)(3). Henderson moved to suppress the seized firearms, arguing that the protective sweep was unreasonable and in violation of the Fourth Amendment. Sergeant Wolff and two other South Bend SWAT officers testified at an evidentiary hearing. The district court judge denied the motion.

After a two day trial, the jury found Henderson guilty. Neither Davis nor Henderson testified at trial. However, both testified at the sentencing hearing and provided conflicting stories about what happened inside Henderson's house on the morning of September 19, 2010. Davis testified essentially consistent with her statement recorded on the squad car's video camera. Henderson denied Davis' version of the events. He said they talked, drank, had sex, and he fell asleep. He recounted that he awoke and found police surrounding his house, Davis still inside, and his keys on his bed. He testified that Davis brought the handguns and drugs found by the police to his house.

Henderson theorized that Davis concocted the criminal confinement story because she was unfaithful to Winfield and her text messages were only a ploy to explain why she stayed the night with Henderson. The district court judge found the events more likely than not to have occurred as described by

Henderson. Except, the judge did not believe Henderson's statement that Davis brought the handguns and drugs to his house. The judge sentenced Henderson to thirty-nine months' imprisonment, followed by three years' supervised release, and the payment of a $100 special assessment.

## II. DISCUSSION

The sole issue raised by Henderson on appeal is his claim that the protective sweep was unreasonable because there were no articulable facts that Henderson's house harbored an individual who posed a threat to those on the scene after Henderson exited.

When the district court denies a motion to suppress, we review legal conclusions or mixed questions of law and fact *de novo*. *United States v. Delgado*, 701 F.3d 1161, 1164 (7th Cir. 2012). We review the district court's factual findings for clear error. *Id*. The facts in this case are not in dispute, so we review the district court's legal conclusion that the police acted reasonably in performing a protective sweep *de novo*. *United States v. Tapia*, 610 F.3d 505, 510 (7th Cir. 2010).

The Fourth Amendment, as applied to the states through the Fourteenth Amendment, imposes two express requirements on the government. *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011). "First, all searches and seizures must be reasonable. Second, a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." *Id*. The Court has inferred that in most situations police must obtain a warrant prior to conducting a search, but it has defined certain reasonable exceptions when a warrant is not required. *Id*.

One well-established exception to the warrant requirement is when the police search a house during a protective sweep. *Maryland v. Buie*, 494 U.S. 325, 327 (1990). "A 'protective sweep' is a quick and limited search of premises, incident to arrest conducted to protect the safety of police officers or others." *Id*. The Fourth Amendment permits a protective sweep "if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others." *Id*. (internal citations omitted). A protective sweep is "aimed at protecting the arresting officers" and is "not a full search of the premises." *Id*. at 335. The search is limited to a cursory inspection into spaces where other assailants may be hiding and must not last "longer than is necessary to dispel the reasonable suspicion of danger." *Id*. at 335–36.

In *Buie*, the police executed an arrest warrant in Buie's house after he and his accomplice were suspected of armed robbery. 494 U.S. at 328. The police arrested Buie after he emerged from the basement of his home. *Id.* A detective then entered the basement "in case there was someone else" down there. *Id.* The detective who searched the basement did not have any information that anyone was actually in the basement, but went down there to secure the area anyway. *Id.* While checking the basement, the detective seized a red running suit that matched the description of a suit worn by one of the robbery suspects. *Id.* The introduction of the red running suit at trial was permissible because the police seized it during

a reasonable protective sweep. *Id*. at 337. The holding from this seminal case carries the day today.

This circuit has applied and preserved the *Buie* standard in five cases with facts similar to this case; in each case we found that "specific and articulable facts" existed to support the officers' reasonable conclusions that areas needed to be swept to search for individuals posing a threat to the officers or others. *United States v. Starnes*, 741 F.3d 804 (7th Cir. 2013); *Tapia*, 610 F.3d 505 (7th Cir. 2010); *United States v. Burrows*, 48 F.3d 1011 (7th Cir. 1995); *United States v. Barker*, 27 F.3d 1287 (7th Cir. 1994); *United States v. Richards*, 937 F.2d 1287 (7th Cir. 1991). We recognized that "[t]he inquiry is an exceptionally fact-intensive one in which we must analyze myriad factors including, among other consideration, the configuration of the dwelling, the general surroundings, and the opportunities for ambush." *Starnes*, 741 F.3d at 808 (citing *Burrows*, 48 F.3d at 1016). We recognized that "[t]he philosophy behind a protective sweep, however, remains the same regardless how the officers arrived in the home." *Id.* at 810. We also emphasized that "the sweep is a device that can easily be perverted to achieve ends other than those acknowledged as legitimate in *Buie*." *Burrows*, 48 F.3d at 1017. Therefore, we have ensured that our opinions "neither expand nor contract the law enforcement's right to perform such a sweep" and continue to apply "the same concise standard announced in *Buie*." *Starnes*, 741 F.3d at 811.

In this case, the record is replete with specific and articulable facts which the SWAT officers reasonably relied upon to conclude that the officers or others faced a dangerous situation without a protective sweep of Henderson's house. The facts

justifying the SWAT team's protective sweep can be boiled
down to the following: The SWAT team received a report of a
hostage situation, validated by text messages on Winfield's
phone and the officers' sighting of movement within the house.
The text messages from Davis said that she was being held by
someone with a gun. The officers called over the PA loud-
speaker for over an hour demanding for the occupants of the
house to come out, but instead of cooperating, the occupants
remained locked in the house. The officers did not know how
many occupants or what the occupants were doing inside the
house during the standoff. Davis appeared to be frightened
when she exited. When Davis and Henderson exited the house,
neither were armed. All of the doors were locked and the
house was two stories; large enough for others to hide and
ambush the officers or bystanders. The SWAT team had
information that Henderson possessed a gun but no weapons
were found on his person when he was arrested; it was
reasonable to infer that an armed and dangerous person
remained in the house. As we have found in the past, "a bevy
of facts supports the conclusion that such a sweep was reason-
able and prudent." *Starnes*, 741 F.3d at 810.

Henderson faults the officers for not communicating
directly with Davis via text message to gather information
about whether additional victims or suspects might also have
been in the house. Henderson argues that because the officers
had no information that there were additional people in
Henderson's house, it was unreasonable to conduct a protec-
tive sweep.

We take a moment to entertain Henderson's suggestion that
the officers needed to confirm with Davis how many people

were in the house before conducting a protective sweep. SWAT officer Hanley's testimony at the suppression hearing explained the scenario best: "Well, we can't believe the suspect, nor can we always believe a victim, so entry is always made by SWAT in a situation like this just to make sure there's [sic] no additional victims." The district court judge confirmed SWAT officer Hanley's rationale at Henderson's sentencing; the judge found that Davis likely lied about being a hostage and Henderson's version of the story was more plausible. It is not realistic for police officers to always rely on the statements of people involved at a crime scene; they sometimes provide wrong information, or sometimes flat out lie.

Since *Buie*, the standard and philosophy behind a protective sweep remain the same—"there must be articulable facts, which taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334. Making an arrest on the adversary's "turf" may create the threat of ambush and justify a protective sweep. *Id.* at 333. *See also, Starnes*, 741 F.3d at 808 (recognizing the potential of ambush as a legitimate reason to perform a protective sweep); *Tapia*, 610 F.3d at 511 ("Officers should not be forced to suffer preventable risk of ambush, even where a location is so isolated that the officers could conceivably be protected without entering the area."); *Burrows*, 48 F.3d at 1017 ("officers had the right to ensure their safety and the safety of everyone else in the area not only during the arrest itself but also during the remainder of the time that they were legally on the premises and its environs"); *Barker*, 27 F.3d at 1291 (holding that a protective

sweep was reasonable because the officer believed the area 'swept' harbored weapons and an individual posing danger to the officer or others); *Richards*, 937 F.2d at 1291 (stating that an officer would not need "a warrant to enter the house of a person who is holding hostages inside").

And, the duration and scope of the protective sweep in this case were reasonable. The SWAT team entered the house within ten minutes of detaining Henderson. Unable to operate the front door lock with the keys found on Henderson, the SWAT team forced their way into the house through the back door. Once inside, they secured the premises to ensure nobody remained in the house, victim or assailant. The sweep was cursory and lasted no longer than five minutes. SWAT officer Graber testified that the sweep was "probably five—no more than five minutes" and "nothing was touched or moved." Other than the SWAT team, the South Bend Police Department remained outside until the court issued the search warrant and a full search was feasible. The district court did not err in denying Henderson's motion to suppress.

### III.  CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.