# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
KERN,[1] KRAUSS, and BORGERDING
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist LEVI A. KEEFAUVER**
**United States Army, Appellant**

ARMY 20121026

Headquarters, 101st Airborne Division (Air Assault) and Fort Campbell (convened)
Headquarters, Fort Campbell (action)
Timothy Grammel, Military Judge (arraignment and motion hearing)
Steven E. Walburn, Military Judge (trial)
Lieutenant Colonel Jeff A. Bovarnick, Staff Judge Advocate

For Appellant: Captain Patrick J. Scudieri, JA (argued); Colonel Kevin Boyle, JA; Lieutenant Colonel Peter Kageleiry, Jr., JA; Major Vincent T. Shuler, JA; Captain Patrick J. Scudieri, JA (on brief and on supplemental brief); Colonel Kevin Boyle, JA; Major Vincent T. Shuler, JA; Captain Patrick J. Scudieri, JA (on reply brief).

For Appellee: Captain Benjamin W. Hogan, JA (argued); Colonel John P. Carrell, JA; Lieutenant Colonel James L. Varley, JA; Major Robert A. Rodrigues, JA; Captain Benjamin W. Hogan, JA (on brief).

29 July 2014

------------------------------------
OPINION OF THE COURT
------------------------------------

BORGERDING, Judge:

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of two specifications of violating of a lawful general regulation by wrongfully possessing drug paraphernalia and unregistered weapons on-post, one specification of wrongful possession of marijuana, and one specification of child endangerment in violation of Articles 92, 112a, and 134,

---

[1] Senior Judge Kern took final action in this case prior to his permanent change of duty station.

Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 892, 912a, 934 (2006). The military judge sentenced appellant to a bad-conduct discharge, confinement for four years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the adjudged sentence.

This case is before the court for review pursuant to Article 66, UCMJ. Appellant asserts the military judge abused his discretion by denying a motion to suppress evidence obtained during an alleged illegal search of appellant's home. Appellant also argues that his conviction for possession of marijuana with intent to distribute is factually and legally insufficient. We find these assignments of error warrant discussion but no relief.[2]

## FACTS[3]

On 8 December 2011, Postal Inspector DV notified Postal Inspector SL that during the course of a drug interdiction effort in the Louisville, Kentucky postal processing center, he discovered a suspicious box that smelled of marijuana. Upon inspection of the box, Inspector SL observed that it was a heavily taped, approximately eight-pound "Ready-Post" priority box, with delivery confirmation and insurance stickers. The return address was a hand-written label showing a "B. Samuelson" mailed it from an address in northern California. When Inspector SL

---

[2] We have also considered appellant's supplemental assignment of error and those matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find they are without merit.

[3] "[A]ppellate courts, in reviewing the correctness of [a] ruling [on a motion to suppress], may consider any evidence presented in the trial of the case." *United States v. Cordero*, 11 M.J. 210, 215 n.3 (C.M.A. 1981) (citing *Carroll v. United States*, 267 U.S. 132, 162 (1925)); *see also United States v. Canieso*, 470 F.2d 1224, 1226 (2d Cir. 1972) ("It is settled law that the validity of an arrest or search can be supported by evidence which was adduced at trial even though this was not presented at the pretrial suppression hearing."); *United States v. Pearson*, 448 F.2d 1207, 1210 (5th Cir. 1971) ("Evidence adduced at trial may be considered even though the evidence on the motion to suppress was insufficient to justify the search."); *United States v. Hinojosa*, 606 F.3d 875, 880 (6th Cir. 2010) ("This court is not restricted to considering only the evidence presented at a suppression hearing, and it may consider evidence offered at trial to uphold the denial of a motion to suppress."); *United States v. Gray*, 491 F.3d 138, 148 (4th Cir. 2007); *United States v. Martins*, 413 F.3d 139, 144 (1st Cir. 2005); *United States v. Villabona-Garnica*, 63 F.3d 1051, 1056 (11th Cir. 1995); *Rocha v. United States*, 387 F.2d 1019, 1021 (9th Cir. 1967).

searched an address database to determine if the sender's information was legitimate, he found no record of a "B. Samuelson" at the return address.[4]  These facts, coupled with an odor of marijuana emanating from the box, indicated to Inspector SL the box was being used for drug trafficking.[5]  The box was addressed to "T. Keefauver," at a house address on Fort Campbell, Kentucky.  Military investigators confirmed the name of the family living at that particular address was "Keefauver."

Since the box was addressed to a house located on Fort Campbell, Inspector SL contacted the Drug Suppression Team Chief at the Fort Campbell Criminal Investigation Command (CID) office, Special Agent (SA) SR, in hopes of conducting a "controlled delivery."[6]  Inspector SL and two other postal inspectors drove the box to Fort Campbell.

Meanwhile, SA SR obtained a verbal authorization from the military magistrate, Captain (CPT) MR, to conduct a controlled delivery of the package and then, in SA SR's understanding, to "go into the house and search for the package after it was taken into the house."  Special Agent SR also understood that "once the package was found, any additional search, if we had a K9 search the house and alerted to any other drugs inside the house, that we would have authorization to search the rest of the house."  Captain MR described his verbal authorization as, "if the box--the package goes into the house, you may search the room, depending on if you go in right after it, you can search that immediate area that you find the package, and that's the limit of your search."  Captain MR also authorized a search of locations where the K9 military working dog (MWD) alerted to marijuana.  The magistrate's actual limits on when the MWD could enter the home and where it could go were not clearly defined during the motion.

Once Inspector SL arrived at the Fort Campbell CID office with the box, SA SR had a MWD handler inspect the package.  The MWD handler indicated that the MWD alerted on the box, meaning it likely contained a controlled substance.

---

[4] However, Inspector SL did discover appellant and his wife had claimed the return address in Northern California as their address in years past.

[5] The military judge recognized Inspector SL as an expert in drug trafficking without objection from the defense.

[6] Inspector SL testified a "controlled delivery" is a delivery controlled by law enforcement personnel whereby they "mimic" what a regular letter carrier would normally do every day in the event that the individuals expecting the package are conducting surveillance and tracking the package.

Special Agent SR then organized the controlled delivery of the package to the recipient's address. The team conducted surveillance in the front and the rear of the recipient's house and watched as a member of the postal inspection team delivered the box. When no one answered the door, the agent put the box on the front doorstep and the team waited outside for approximately an hour until an individual later identified as appellant's 16-year-old stepson, TC-D, came home and took the box inside.

Once the package was inside the house, the surveillance team moved in and entered the home to retrieve the box. TC-D answered the door and SA SR informed him that he was with the police and was there to search the home. TC-D became "irate," yelling an "ungodly tirade of obscenities" at the agents including, "what the fuck" and "get the fuck off my property," as well as "I hate pigs," "I hate cops," "[c]ops can all die," or words to that effect. He was placed in handcuffs and seated near the garage. Special Agent SR immediately located the package right inside the home in the hallway, about ten feet from the front door.

Once the package was located, SA SR conducted a "security sweep" of the home to "ensure that no one else was inside the house" and that no one was "destroying evidence." He indicated "[i]t's standard procedure for any law enforcement to clear a house . . . for safety of officers to make sure no one is inside with a gun, no one's inside with a knife, or try to [sic] hurt someone that we don't know is there." He later testified "[t]he purpose of the security sweep is to ensure that--for safety--make sure that there's nobody inside with a weapon that can harm one of my officers." The sweep lasted "a couple of minutes."

Special Agent SR began this sweep in the downstairs area where he saw a "marijuana-type smoking device" on the kitchen counter. He then continued upstairs where he saw a bag of what appeared to be marijuana laying in plain view on the bed in TC-D's room as well as at least two items of drug paraphernalia, also in plain view, in the room. He also saw "a couple rifles" in an unlocked walk-in closet in the hallway.[7] In the master bedroom, also in plain view, he saw more boxes with similar characteristics to the one that had just been delivered, all of which bore similar indicia of drug trafficking.

It was only after the protective sweep was completed and the home was cleared that the MWD came in, conducted a search, and alerted on multiple areas within the house. Upon entry into the house, several of the law enforcement agents

---

[7] Prior to the controlled delivery, CID agents determined that no one living in the home had firearms registered with Fort Campbell authorities pursuant to Fort Campbell regulations.

noted there was a very strong smell of marijuana emanating from the house in general and not just from the box.

The MWD alerted as soon as it entered TC-D's room. In addition to the items seen in plain view by SA SR, investigators found more amounts of marijuana throughout the room, both loose and in small Ziploc bags. Next, although SA SR did not recall seeing any items in plain view in the room later determined to belong to appellant's 13-year old biological son, EK, the MDW alerted on a container found in plain view on the floor in the middle of the room. In addition, the MDW alerted on a dresser drawer where investigators found more marijuana, rolling papers, and a pipe.

In the master bedroom, the MWD alerted to additional bags of marijuana located in a dresser. The investigators also found a vaporizer which appeared to be used to smoke marijuana, a scale which could be used to weigh drugs, and a large sum of money in a dresser drawer.

In the downstairs area of the home, the MWD alerted on a black duffel bag found inside a closet under the stairs, located near where appellant had been sleeping.[8] It contained no marijuana but did contain $4000 in cash. Investigators also found an amount of cash inside a teapot in the dining room. In a closet immediately inside the residence, investigators found two handguns stored in a locked container and a bag of marijuana inside a bin of toy cars. Finally, investigators searched garbage cans outside the house and found plastic bags similar to ones found inside the house that had $1000, $2000, $8000, and $8300 written on them. All items, including those SA SR saw in plain view during his protective sweep, were seized and admitted into evidence at trial.

Investigators opened the box originally delivered to the home while it was still inside the residence. The box contained approximately three to four pounds of "high grade" marijuana packaged in a manner consistent with drug trafficking.

After the search of the home, SA SR prepared a written search and seizure authorization apparently intended to document CPT MR's verbal authorization. Captain MR testified that SA SR typed the authorization and CPT MR reviewed and signed it. Captain MR did not recall receiving any additional information between the time he gave the verbal authorization and when he issued the written authorization. This written authorization permitted a search for "any evidence of the

---

[8] Appellant and his wife were having marital problems, so appellant was sleeping in the downstairs living room.

criminal offense [sic] Wrongful Possesion [sic], distribution and/or Use of a Controlled Substance."

Later, at the CID office, investigators searched both appellant and EK "for officer safety in accordance with . . . standard operating procedures." During these searches, they found $900 in cash consisting of nine $100 bills in appellant's pockets and $692 in EK's pockets. After seeing his sons at the CID office, appellant told the investigators "all the stuff you found in the house is mine, I don't want my family getting in trouble," or words to that effect.

## LAW AND DISCUSSION

### *Search and Seizure*

#### Standard of review

We review a military judge's ruling on a suppression motion for an abuse of discretion. *United States v. Monroe*, 52 M.J. 326, 330 (C.A.A.F. 2000). We review a military judge's findings of fact under the clearly-erroneous standard and his conclusions of law under a de novo standard. *Id*. "Thus, on a mixed question of law and fact as in this case, a military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect." *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995). In addition, our review is "shaped by the outcome of the trial below" as our superior court has held that "in reviewing a ruling on a motion to suppress, we consider the evidence 'in the light most favorable to the prevailing' party." *United States v. Leedy*, 65 M.J. 208, 213 (C.A.A.F. 2007) (quoting *United States v. Reister*, 44 M.J. 409, 413 (C.A.A.F. 1996)).

#### Protective Sweep

The Fourth Amendment of the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (citation omitted).

"[S]earches and seizures inside a home without a warrant are presumptively unreasonable," however, "this presumption may be overcome in some circumstances because [t]he ultimate touchstone of the Fourth Amendment is reasonableness." *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) (quoting *Brigham City v. Stuart*,

6

547 U.S. 398, 403 (2006)) (internal quotation marks omitted); *see also Riley v. California*, 134 S. Ct. 2473, 2482 (2014). Thus, there are "a few specifically established and well-delineated exceptions" to the warrant requirement of the Fourth Amendment. *United States v. Wicks*, 73 M.J. 93, 99 (C.A.A.F. 2014) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)) (internal quotation marks omitted). "Where the government obtains evidence in a search conducted pursuant to one of these exceptions, it bears the burden of establishing that the exception applies." *Id.* (quoting *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000)); *see also* Military Rule of Evidence [hereinafter Mil. R. Evid.] 311.

One of these exceptions is the "protective sweep" exception established in *Maryland v. Buie*, 494 U.S. 325, 327-28 (1990). "A protective sweep is a quick and limited search of premises conducted to protect the safety of police officers or others." *United States v. Starnes*, 741 F.3d. 804, 807 (7th Cir. 2013) (citing *Buie*, 494 U.S. at 327). The *Buie* Court recognized this exception, noting that "in determining reasonableness, we have balanced the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Buie*, 494 U.S. at 331. Under certain circumstances, a protective sweep is permissible because these legitimate governmental interests (in this case, the safety of law enforcement officials) "outweigh an individual's interest in the protection of the Fourth Amendment." *Starnes*, 741 F.3d at 807-08 (citing *Buie*, 494 U.S. at 331).

As noted above, however, a protective sweep is not without limits. It consists of two prongs. First, "as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 334.[9] Second, and

---

[9] Although *Buie* involved an in-home arrest, federal circuit courts have almost routinely expanded the "protective sweep" doctrine to apply in situations where there is lawful entry for reasons other than an in-home "arrest." *Starnes*, 741 F.3d at 810; *Martins*, 413 F.3d at 149-50; *United States v. Miller*, 430 F.3d 93, 100 (2d Cir. 2005); *United States v. Taylor*, 248 F.3d 506, 513 (6th Cir. 2001); *United States v. Garcia*, 997 F.2d 1273, 1282 (9th Cir. 1993); *see also United States v. Billings*, 58 M.J. 861, 864 (Army Ct. Crim. App. 2003) ("[W]e will not impose a bright-line rule limiting protective sweeps to in-home arrests; it is clear that 'in some circumstances, an arrest taking place just outside a home may pose an equally serious threat to the arresting officers.'" (quoting *United States v. Colbert*, 76 F.3d 773, 776 (6th Cir. 1996))). The Seventh Circuit in *Starnes* succinctly explained the rationale:

(continued . . .)

particularly applicable in this case, a *more expansive* sweep is permitted if there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* Moreover, even if such a sweep is permitted:

> [It] is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.

*Id.* at 335-36 (footnote omitted).

Determining the validity of a protective sweep "is an exceptionally fact-intensive one in which we must analyze myriad factors including, among other considerations, the configuration of the dwelling, the general surroundings, and the opportunities for ambush." *Starnes*, 741 F.3d at 808.

At the time SA SR conducted the sweep, investigators were aware that: 1) an eight-pound box containing marijuana had just been delivered to the home; 2) in addition to TC-D, appellant, his wife, and EK lived in the home; 3) although no one was seen entering the home during the time it was under surveillance, no one was seen leaving it either; thus the agents did not know the whereabouts of the adults who lived in the home and it was not unreasonable to believe they could still be in

---

(. . . continued)
> The philosophy behind a protective sweep . . . remains the same regardless of how the officers arrived in the home. When officers enter the residence of a criminal suspect and have reason to believe that a particular area might harbor an individual . . . who poses a danger to the officers or others, the Fourth Amendment permits a quick and limited protective sweep. . . . Thus the constitutionality of a protective sweep does not depend on whether that sweep is incidental to a search warrant, an arrest warrant, or a consensual search.

741 F.3d at 810.

the home;[10] and most important, 4) upon discovery that the police were at his home, TC-D became "irate" and combative, shouting, "I hate pigs. I hate cops. Cops can all die," or words to that effect and he had to be placed in handcuffs and moved away from the front entryway.[11] It was soon after this incident that SA SR conducted his protective sweep. We find that these "specific and articulable facts" "would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334, 337. We note also that TC-D's behavior could have caused investigators to reasonably believe that anyone in the home could have heard TC-D's tirade, take it as a warning, and attempt to destroy evidence. *See Billings*, 58 M.J. at 864 (citing *United States v. Oguns*, 921 F.2d 442, 446-47 (2d Cir. 1990)).

In making his findings of fact and conclusions of law regarding the protective sweep, the military judge found "[f]rom that amount [approximately eight pounds] of marijuana, one can reasonably infer that residents of the home were involved in distributing drugs; [i]t is common knowledge that drug trafficking involves violence, including the use of weapons." Although Inspector SL later testified on the merits that the evidence found in appellant's home indicated drug trafficking and in his experience "guns follow drugs," we find that this drug trafficking-gun-violence connection does not *per se* authorize a protective sweep. *See United States v. Taylor*, 248 F.3d 506, 514 (6th Cir. 2001) (citing *United States v. Hatcher*, 680 F.2d 438, 444 (6th Cir. 1982)).[12] To the contrary, a military judge ruling on a suppression

---

[10] Appellant testified at trial that his wife spent a significant amount of time at home in her room.

[11] Although SA SR testified he conducted the sweep pursuant to standard procedure and did not articulate some of these facts during his testimony in the Article 39(a), UCMJ, session, "reasonable suspicion is an objective standard," *Martins*, 413 F.3d at 149, and thus we look to the entire record to determine if "a reasonably prudent officer" would believe the area harbored "an individual posing a danger" to officials at the scene. *Buie*, 494 U.S. at 334; *see also Miller*, 430 F.3d at 99. We emphasize that, under *Buie*, conducting a protective sweep cannot be done solely based on standard procedure, but must always be based on "specific and articulable facts" unique to each situation. *See Buie*, 494 U.S. at 337.

[12] *But see United States v. Patrick*, 959 F.2d 991, 996 (D.C. Cir. 1992) (protective sweep could have been authorized based on reasonable belief inhabitant was trafficking in narcotics), *abrogated on other grounds by Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Starnes*, 741 F.3d at 806 ("Police officers conducting raids assume that drug dealers are armed, and the assumption is generally correct, as weapons are a necessary tool of the drug trade."). We note that in *Starnes*, there

(continued . . .)

motion must still find that "the searching officer possesse[d] a reasonable belief based on *specific and articulable facts* that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 337 (emphasis added). While the mere presence of a large amount of drugs is a factor that may be considered in the analysis, this fact alone without any other "specific and articulable facts" does not justify a protective sweep. *See id.*; *see also United States v. Reid*, 226 F.3d 1020, 1028 (9th Cir. 2000).

Nevertheless, in this case there are additional facts, including the unknown whereabouts of the adults in the household and the behavior of TC-D, along with the unobjected to testimony of an expert in drug trafficking that "guns follow drugs," that allow us to conclude the military judge did not abuse his discretion in finding SA SR's protective sweep of appellant's home was justified.

In addition, we agree with the military judge's conclusion that "[t]he sweep was properly conducted in a quick manner in places where individuals may be hiding." Special Agent SR testified it took "a couple of minutes" and everything he saw was in plain view. *See Buie*, 494 U.S. at 337 ("There is . . . no dispute that if [the investigator's] entry into the [house] was lawful, the seizure of the [item in question], which was in plain view and which the officer had probable cause to believe was evidence of a crime, was also lawful under the Fourth Amendment."). Special Agent SR was clear that he was searching for people and he looked only in areas where he might find people, like under beds or in closets. Once he determined there were no people in a room, he would move on to the next room. Thus, he conducted a properly limited sweep under the principles articulated in *Buie*.

Considering the evidence in the light most favorable to the prevailing party, *Leedy*, 65 M.J. at 213, we conclude the military judge did not abuse his discretion when he found the agents were authorized to conduct a protective sweep and the "sweep was properly conducted in a quick manner in places where individuals may be hiding." Accordingly, he properly admitted the evidence seen by SA SR in plain view during the sweep.

Nevertheless, we reiterate the Seventh Circuit Court's admonishment in *Starnes*:

---

(. . . continued)
were still myriad other factors in addition to narcotics trafficking that justified a protective sweep. 741 F.3d at 806 (these factors included a shooting at the residence hours before the planned raid; two aggressive pit bulls on the premises; other apartment doors open indicating the possible presence of others; and occupants of the targeted apartment alerted by gunfire).

> We continue to recognize that the sweep is a device that can easily be perverted to achieve ends other than those acknowledged as legitimate in *Buie*. This opinion neither expands nor contracts law enforcement's right to perform such a sweep. Regardless of the context of an officers entry into a home, the same concise standard announced in *Buie* stands:
>
> The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene.

741 F.3d at 810-11 (quoting *Buie*, 494 U.S. at 337) (internal citations and quotation marks omitted).

### Inevitable Discovery

We turn now to the military judge's conclusion that the remainder of the evidence offered against appellant was properly admitted because it "would have inevitably been discovered." The Supreme Court recognized the "inevitable discovery exception" to the exclusionary rule in *Nix v. Williams*, 467 U.S. 431, 444 (1984). This exception allows the "admission of evidence that, although obtained improperly, would have been obtained by another lawful means." *United States v. Wallace*, 66 M.J. 5, 10 (C.A.A.F. 2008) (citing *Nix*, 467 U.S. at 444); *see also* Mil. R. Evid. 311(b)(2) ("Evidence that was obtained as a result of an unlawful search or seizure may be used when the evidence would have been obtained even if such unlawful search or seizure had not been made.").

For the inevitable discovery exception to apply, the government had to demonstrate by a preponderance of the evidence "that when the illegality occurred, the government agents possessed, or were actively pursuing, evidence or leads that would have inevitably led to the discovery of the evidence and that the evidence would inevitably have been discovered in a lawful manner had not the illegality occurred." *United States v. Dease*, 71 M.J. 116, 122 (C.A.A.F. 2012) (quoting *United States v. Kozak*, 12 M.J. 389, 394 (C.M.A. 1982)) (internal quotation marks omitted); *see also Wicks*, 73 M.J. at 103. "When the routine procedures of a law enforcement agency would inevitably find the same evidence, the rule of inevitable discovery applies even in the absence of a prior or parallel investigation." *United States v. Owens*, 51 M.J. 204, 210-11 (C.A.A.F. 1999). In addition, the inevitable discovery doctrine "cannot rescue evidence obtained via an unlawful search simply because probable cause existed to obtain a warrant when the government presents *no*

evidence that the police would have obtained a warrant." *Wicks*, 73 M.J. at 103 (citations omitted).

The military judge made the following findings of fact with respect to CPT MR's search authorization:

> Captain [MR] verbally issued a search authorization, if the package was delivered, to search the house at [appellant's address] on Fort Campbell, for the box that was the subject of the controlled delivery soon after it is delivered[.]
>
> He limited the search by stating that, once the box was found, they could search only the immediate area in the room in which the box was found for any evidence of possession, use, or distribution of controlled substances[.]
>
> He also stated that, if K9 dogs indicated the presence of drugs, then they could search anywhere the dogs indicated[.]

The military judge then concluded:

> Based on the way the verbal authorization was issued and executed, the continued search of the house after [the protective sweep] was beyond what the magistrate had authorized[.]
>
> However everything that was discovered during those later searches would have inevitably been discovered[.]
>
> At that time, there was reason to believe that approximately 8 pounds of marijuana was delivered to that residence and that there was already marijuana, drug paraphernalia, and weapons in that residence[.]
>
> The next immediate step for any reasonable law enforcement officer would have been to request a search authorization of the whole residence based on all of the information[.]
>
> Based on the totality of the circumstances, there was overwhelming evidence to support a request for search authorization, and any magistrate would have authorized a

> search of the residence for evidence of drug distribution
> and use, such as drugs, drug paraphernalia, weapons[.]
>
> In summary, all the evidence at issue in this motion was
> obtained either pursuant to a lawful search authorization
> or would have been inevitably been discovered.

Based on our reading of the record, the military judge's findings of fact as to what CPT MR authorized are not clearly erroneous.[13] After a de novo review, we agree with the military judge's conclusion that "the continued search of the house after [the protective sweep] was beyond what the magistrate had authorized." Once SA SR completed his protective sweep, he "stepped outside and waited for K9 to arrive." He did not contact CPT MR to obtain an additional warrant based on the items he saw during the sweep nor did he obtain any other warrant or authorization to continue the search of the home beyond the limits established by the verbal authorization.[14] Thus, the MWD's search of appellant's home was a warrantless

---

[13] Captain MR's testimony on the motion was, at best, unclear. The military judge engaged in a lengthy colloquy with him in an attempt to understand what he had and had not authorized. Captain MR's testimony varied over six pages of the record from, "I authorized him to look in the house for evidence of marijuana, for evidence of distribution of marijuana," to "if you find the box immediately upon entry, then your--your limit of search is limited to the room where you find that box." The military judge finally attempted to paraphrase what CPT MR was trying to say:

> So you told them that if the box was delivered, they could
> enter the house and search for any evidence of possession
> or distribution of marijuana, which is broad, but then if
> they find the box, then they are limited to a room. So, if
> they find the box, then the scope of their search is now
> decreased substantially. And then another thing after that
> is, if K9 dogs alert, then they can search where the K9s
> alerted.

Captain MR agreed with this still somewhat confusing rendition.

[14] Captain MR specifically testified he was given no new information between the time he gave the verbal authorization to SA SR to enter the home to find the box and the time he gave SA SR the written authorization after the search was completed. Based on our review of the entire record, there was ample "new information" SA SR could have relayed to CPT MR to convince him there was now probable cause to search the entire house. In addition to the multitude of items SA SR saw in plain

(continued . . .)

13

search. "With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Kyllo v. United States*, 533 U.S. 27, 31 (2001).

However, at the time of the MWD's search, investigators knew that: 1) an eight-pound box containing marijuana had been delivered to the home; 2) the home smelled strongly of marijuana apart from the box; and 3) the home contained additional marijuana, drug paraphernalia, weapons, and boxes very similar to the one delivered that day. *See United States v. Alexander*, 540 F.3d 494, 502 (6th Cir. 2008) ("The inevitable discovery doctrine 'requires . . . [a] court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred.'" (quoting *United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir. 1995))).

As SA SR testified, with the knowledge of the delivery of the box and what he saw during his sweep: "[i]f we had not contacted the magistrate prior to that, we would have contacted a magistrate or tried to, you know, obtain a verbal consent or something like that . . . to try and obtain and [sic] authorization . . . to search the house." This testimony, in conjunction with the fact that a written authorization was later secured from CPT MR, establishes some evidence on the record "that the police would have obtained a warrant" in this case. *Wicks*, 73 M.J. at 103. Accordingly, this is not a case where "evidence [was] obtained via an unlawful search simply because probable cause existed to obtain a warrant." *Id.*

Moreover, SA SR's response indicates to us he believed he had *already* contacted a magistrate and that he *already* had that magistrate's authorization to search. During the motion he testified he had:

> [V]erbal authorization to go into the house and search for the package after it was taken into the house. The authorization was to search for the package inside the house and *once the package was found, any additional search, if we had a K9 search the house and alerted to any other drugs inside the house, that we would have authorization to search the rest of the house*.

---

(. . . continued)

view during his sweep, almost every law enforcement official who entered the house testified the home had a strong smell of marijuana as soon as they stepped through the front door. We have no doubt CPT MR would have authorized the MWD search had he been consulted.

(Emphasis added). After hearing CPT MR's understanding of the authorization, the military judge recalled SA SR and asked him again where CPT MR authorized him to search and for what. Special Agent SR responded:

> SA SR: To go into the house to find the package and then from there, he didn't authorize a search of the rest of the house *unless we had K9 present, because I told him that we would have K9 present and they would--and he said that if they alerted in the house, that they would be able to-- that would give probable cause to authorization [sic] to search the rest of the house.*

(Emphasis added). The following exchange then occurred between SA SR and the military judge:

> MJ: So that's what you were looking for. Where could you look for that package? Did he authorize you to look through the entire house for that package or?
>
> SA SR: Rooms weren't specified, it was just inside the residence until, you know, until we found the package.
>
> MJ: Okay, at what time--- at what point did the K9, the working dogs, enter the house? Did they enter when you initially went in?
>
> SA SR: No.
>
> MJ: Did they go in before or after you found the box?
>
> SA SR: They went in after we found the box.

It appears from SA SR's testimony above, in conjunction with the ambiguity of CPT MR's actual authorization and the fact that SA SR did not even attempt to get a warrant, that SA SR and the other investigators believed they had authorization from the magistrate to search the entire house *if they had the MWD doing the search.* We find that law enforcement agents were not attempting to search without authorization or to run afoul of the Fourth Amendment's warrant requirement, but rather they were relying on what they believed to be a valid search authorization

15

from CPT MR.[15]  Thus, if law enforcement had truly understood that they only had authorization to search for the box and no further, given the information they discovered immediately before the MWD search was conducted, they most certainly would have contacted CPT MR to receive additional authorization to search the rest of the home.  We find "[t]here is no reasonable likelihood that [investigators] would have abandoned [their] efforts to search the [home] at that point."  *See Owens*, 51 M.J. at 210.  Thus, "the routine procedures of a law enforcement agency would [have] inevitably [found] the same evidence."  *Id.* at 210-11.  Accordingly, we hold that the military judge did not abuse his discretion by concluding that the remainder of the evidence would have "inevitably been discovered."

### *Constructive Possession*

In performing our duty under Article 66, UCMJ, we conduct a de novo review of legal and factual sufficiency.  *United States v. Gilchrist*, 61 M.J. 785, 793 (Army Ct. Crim. App. 2005) (citing *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002)).  The test for factual sufficiency is "whether, after weighing the evidence of record and making allowances for not having personally observed the witnesses, [this court is] convinced of appellant's guilt beyond a reasonable doubt." *Gilchrist*, 61 M.J. at 793 (citing *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)).  The test for legal sufficiency is whether, considering the evidence "in the light most favorable to the [g]overnment, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Winckelmann*, 70 M.J. 403, 406 (C.A.A.F. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

In the Specification of Charge I, appellant is charged with possession of marijuana with the intent to distribute.  "'Possess' means to exercise control of something."  *Manual for Courts Martial, United States* (2008 ed.) [hereinafter *MCM*], pt. IV, ¶ 37.c(2).  "Possession must be knowing and conscious."  *MCM*, pt. IV, ¶ 37.c(2).  To convict appellant of this specification, the government is therefore required to prove, *inter alia,* that appellant knowingly and intentionally possessed a certain amount of a controlled substance, in this case, 5.25 pounds of marijuana. *See United States v. Wilson*, 7 M.J. 290 (C.M.A. 1979); *MCM*, pt. IV, ¶ 37.b(6)(a), c(2).

"Possession may be direct physical custody . . . or it may be constructive . . . ." *MCM*, pt. IV, ¶ 37.c(2).  Under the facts of this case, appellant's possession of the marijuana was constructive, requiring the government to prove appellant "was

---

[15] We note the investigators *did* get additional authorization from CPT MR to search appellant's vehicles.

knowingly in a position or had the right to exercise dominion and control over it either directly or through others." *Wilson*, 7 M.J. at 293 (internal citations and quotation marks omitted); *see also MCM*, pt. IV, ¶ 37.c(2) ("An accused may not be convicted of possession of a controlled substance if the accused did not know that the substance was present under the accused's control."). "[P]ossession may be established by circumstantial as well as by direct evidence." *Wilson*, 7 M.J. at 293; *see also MCM*, pt. IV, ¶ 37.c(2). "[P]ossession exists though it is jointly shared." *Wilson*, 7 M.J. at 293; *see also MCM*, pt. IV, ¶ 37.c(2) ("It is possible, however, for more than one person to possess an item simultaneously, as when several people share control of an item."). "[W]here two or more persons share occupancy of the premises together with the right to exclude others, any one or more, depending upon the circumstances, may have knowing dominion and control over a particular object and the choice between those alternatives must be based on more than mere speculation." *Wilson*, 7 M.J. at 293; *see also MCM*, pt. IV, ¶ 37.c(2) ("Possession inherently includes the power or authority to preclude control by others.").

Having determined that all of the evidence found inside appellant's home was properly admitted at trial, after weighing the evidence of record and making allowances for not having personally observed the witnesses, we are convinced of appellant's guilt of constructive possession of marijuana with intent to distribute beyond a reasonable doubt. *See Gilchrist*, 61 M.J. at 793.

First, although appellant was not at home at the time the box in question was delivered, this box was at least the fourth of such boxes to have been delivered to the home in a two or three-week time span, one of which was addressed to "L. Keefauver." Second, during their search, investigators found myriad tools of the drug distribution trade, including scales for weighing drugs, baggies with dollar values written on them, and large amounts of cash. In particular, in a closet near where appellant was apparently sleeping, investigators found a duffle bag to which the MWD alerted and, although it did not contain marijuana, it contained $4000 in cash. Third, marijuana and items associated with its use were found strewn in plain view in both childrens' rooms, as well as other areas of the house. Indeed, the government called a witness who testified appellant knew of EK's and TC-D's use of marijuana. Fourth, almost every law enforcement official who entered the home noted the strong smell of marijuana throughout the house. Fifth, once appellant was at CID, investigators found $900 in cash, all in $100 bills, on his person, as well as another $692 in his 13-year old son's pockets. Finally, while at CID, appellant told one of the investigators the "stuff" they found in the house belonged to him and that he did not want his "family to get in trouble," or words to that effect.

Moreover, appellant's testimony further convinces us of his guilt. *See generally United States v. Pleasant*, 71 M.J. 709, 712 (Army Ct. Crim. App. 2012) ("When an accused testifies on his own behalf, he does so at his own peril, risking that he might fill in gaps or provide affirmative evidence contributing to or resulting

in his conviction."). In particular, we find appellant's claim that he "never smelled marijuana in the house" to be incredible in light of the testimony described above. Accordingly, we find beyond a reasonable doubt appellant "was knowingly in a position or had the right to exercise dominion and control over [the marijuana] either directly or through others." *Wilson*, 7 M.J. at 293 (internal citation and quotation marks omitted).

We also have no trouble concluding that appellant's conviction is legally sufficient because, considering all evidence in the light most favorable to the prosecution, a reasonable factfinder could have found appellant constructively possessed marijuana found inside his home with the intent to distribute it. *See Winckelmann*, 70 M.J. at 406.[16]

For these reasons, we find the evidence as to appellant's conviction for possession of marijuana with intent to distribute to be factually and legally sufficient.

## CONCLUSION

The findings of guilty and the sentence are AFFIRMED.

Senior Judge KERN and Judge KRAUSS concur.

FOR THE COURT:

ANTHONY O. POTTINGER
Acting Clerk of Court

---

[16] Even were we to conclude the inevitable discovery doctrine does not apply in this case, we would still find the remaining admissible evidence, to include the marijuana in the box, the smell emanating from the home, and the items seen in plain view during SA SR's protective sweep, to be legally and factually sufficient to support appellant's conviction for possession of marijuana with intent to distribute.